UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

CERTAIN UNDERWRITERS AT LLOYDS OF LONDON,

                         Plaintiff,

                - against -

ILLINOIS NATIONAL INSURANCE COMPANY, et al.,

                         Defendants.

09 Civ. 4418 (RJH)

**MEMORANDUM OPINION AND ORDER**

---

Richard J. Holwell, District Judge:

      Plaintiff Certain Underwriters at Lloyds of London ("Lloyds") commenced this declaratory judgment action to determine liability among various insurance companies that issued policies that pertained to a construction job site. Six defendant insurance companies, Illinois National Insurance Company ("Illinois National"), the Insurance Company of the State of Pennsylvania ("ICSOP"), Continental Casualty Company ("Continental"), the Hartford Fire Insurance Company ("Hartford"), Travelers Property Casualty Company of America ("Travelers"), and Arch Insurance Company ("Arch") filed motions for summary judgment. Lloyds filed a cross-motion for partial summary judgment against ICSOP, Travelers, Continental, and Hartford. For the reasons stated below, the motion of Illinois National is granted; the motion of ICSOP is denied; the motion of Continental is granted in part and denied

1

in part; the motion of Hartford is granted; the motion of Travelers is granted; the motion of Arch is granted; and the motion of Lloyds is granted in part and denied in part.

## BACKGROUND

This action stems from a construction accident that occurred on December 14, 2007. The accident occurred at the construction site for Goldman Sachs's new world headquarters. Goldman Sachs hired Adamson Associates Architects ("Adamson") as architects and Tishman Construction Corp. of New York ("Tishman") to be its general contractor. Tishman in turn hired DCM Erectors, Inc. ("DCM") and Component Assembly Systems, Inc. ("CAS") as subcontractors. On the date in question, Norbet Trucking Corporation ("Norbet") was delivering a truckload of metal studs to the construction site. DCM was unloading the truck with a crane. Usually, DCM brought its own slings to attach to the crane for unloading, but on the day in question, it had not. Instead, it borrowed a sling from CAS. DCM tested the sling, then began to unload the studs. After DCM had unloaded several studs, the sling broke and studs fell to the ground. Robert Woo ("Woo"), an architect employed by Admanson, and Wilbert Rocco ("Rocco"), the Norbet truck driver, were injured. Both Woo and Rocco have brought suits in New York state court. Woo has settled, but the Rocco suit is still pending.

## STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact. *See* Fed. R. Civ. P. 56(c). The burden to show the absence of a genuine factual dispute falls on the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A dispute regarding a fact is genuine if the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Elec.*

*Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003).  In evaluating a motion for summary judgment, the court is required to "view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments . . . ." *Wevant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted).

## DISCUSSION

### I. The Illinois National Policy

Illinois National issued an Owner Controlled Insurance Policy to Goldman Sachs.  (Gratt Aff., Ex. 1.)  This policy had a per occurrence limit of $2 million.  (*Id.*, Ex. 1, 6.)  Illinois National claims that it paid $2 million to Woo under this policy (Illinois National/ICSOP Rule 56.1 Stmt, ¶ 22), and Lloyds does not appear to dispute this fact (Lloyds Rule 56.1 Resp. to Illinois National/ICSOP, ¶ 22).  Because Illinois National has already paid out the policy limit for the Goldman Sachs policy, it is not obligated to provide further payment on this policy.  Illiniois National's unopposed motion for summary judgment is granted.

### II. The ICSOP Policy

ICSOP insured the trucking company, Norbet, under an auto insurance policy.  The policy contains two exclusions, one that limits the liability relating to the loading and unloading of vehicles that is performed by mechanical devices not attached to the vehicle (the "mechanical device exception") (Illinois National/ICSOP Rule 56.1 Stmt, ¶ 10) and one that excludes liability for the conduct of third parties (*id*., ¶ 9).  Lloyds argues that this contract is to be governed by New Jersey law and that these exclusions are void as a matter of New Jersey law.  ICSOP argues that New York law should govern the interpretation of the policy.  The first issue the Court therefore must determine is which state's laws govern the policy at issue.

"Federal courts sitting in diversity look to the choice-of-law rules of the forum state." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.,* 363 F.3d 137, 143 (2d Cir. 2004). Under New York choice-of-law rules, "the first step" is to determine "whether there is an actual conflict between the laws invoked by the parties." *Booking v. Gen. Star Mgmt. Co.,* 254 F.3d 414, 419 (2d Cir. 2001) (citation omitted). It is settled New Jersey law that "the obligation to provide coverage in a 'loading and unloading' accident arises from statute and therefore cannot be limited by contract." *Kennedy v. Jefferson Smurfit Co.*, 688 A.2d 89, 91 (N.J. 1997) (quoting *Ryder/P.I.E. Nationwide, Inc. v. Harbor Bay Co.*, 575 A.2d 416, 419 (N.J. 1990)). Pursuant to this requirement, auto insurers must also cover unloading accidents caused by third parties. *Bellafronte v. Gen. Motors Corp.*, 376 A.2d 1294, 1297 (N.J. Super. Ct. App. Div. 1977). In New York, however, an automobile insurance policy "need not cover the liability of a third party for accidents occurring in the loading or unloading of the vehicle." *Argentina v. Emery World Wide Delivery Corp.*, 715 N.E.2d 495, 497 (N.Y. 1999) (citing 11 NYCRR § 60-1.1(c)(3)(iii)). Accordingly, a conflict exists.

When there is a conflict between the relevant states' laws, it is necessary to analyze what the "center of gravity" is for the contract. *Allstate Ins. Co. v. Stolarz*, 613 N.E. 2d 936, 939 (N.Y. 1993). "Under this approach, the spectrum of significant contacts—rather than a single possibly fortuitous event—may be considered." *Id*. There are five generally significant contacts that guide this analysis: the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties. *Id*. at 940. In considering insurance contracts in particular, however, "[t]his approach generally dictates that a contract of liability insurance be governed by the law of the state which the parties understood was to be the principle location of the insured risk . . . ." *Certain Underwriters at Lloyd's,*

4

*London v. Foster Wheeler Corp.*, 822 N.Y.S.2d 30, 33 (N.Y. App. Div. 1st Dep't 2006) (internal quotation omitted).

The location-of-the-risk rule becomes difficult to apply in situations, like here, where the location of the risk is theoretically nationwide. (*Cf.* Gratt Aff., Ex. 2, ISOP00064 (describing the coverage territory as the United States, Puerto Rico, and Canada).) In *Stolarz*, the Court of Appeals considered a car insurance contract negotiated between a New Jersey business and an insurance company. 613 N.E. 2d at 940. The car was involved in an accident in New York, and the driver of the car was a New York resident. *Id.* The Court of Appeals determined that New Jersey law should apply because four of the five factors above weighed in favor of applying New Jersey law. *Id.*

Here, too, the factors point in favor of applying New Jersey law. Norbet is a New Jersey company, and the vehicle involved in the accident was registered in New Jersey. (Lloyd Opp'n, 4.) The insurance policy contains a number of New Jersey-specific riders. (Gratt Aff., Ex. 2.) The major factor in favor of interpreting the policy according to New York law is that the accident itself occurred in New York. Furthermore, because cars are by their nature mobile, it is predictable that ICSOP might insure Norbet for accidents that occurred in New York. Car accidents could occur anywhere, however, and it would unworkable for the same contract to be interpreted under multiple states' laws depending on where an accident occurs. *See Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 153 (2d Cir. 2003) ("Significantly, where the insurance risk is scattered throughout multiple states, courts still deem the risk to be located principally in one state.") The insurance contract at issue seems to have its "center of gravity" in New Jersey, so it should be interpreted under New Jersey law. *See Tri-State Empl. Servs., Inc. v. Manhattan Sur. Co.*, 295 F.3d 256, 261-62 (2d Cir. 2002) (applying New York law to an insurance contract

that was negotiated in New York between New York parties even though the incident occurred at a construction site in Massachusetts).

ICSOP argues that a different result is demanded by *Worth Constr. Co. v. Admiral Ins. Co.*, 836 N.Y.S. 2d 155 (N.Y. App. Div. 1st Dep't 2007).  There, a court applied New York law to an insurance policy issued to a New Jersey company by a New Jersey insurer because the accident occurred in New York.  *Id.* at 156.  The policy at issue, however, contained a special endorsement insuring the company against liability incurred at the White Plains site where the loss at issue occurred.  *Id.*  It is distinguishable from the case at bar, where the policy states that coverage shall be nationwide.  *See Travelers Cas. & Sur. Co. v. Dormitory Auth.*, 2008 WL 4861910, at *5 (S.D.N.Y. Nov. 5, 2008) (distinguishing *Worth* on the same basis).

The Court must go on to apply New Jersey law to this dispute.  The facts of this case are virtually identical to *Bellafronte*, 376 A.2d 1294.  There, a steel company was making a delivery by truck of steel beams.  *Id.* at 1296.  A third party was unloading steel beams from the truck using a crane.  *Id.*  As the third party was unloading the beams, the magnet that attracted the beams attracted a steel beam that was still on the truck, striking the truck driver in the process. *Id.*  The steel company's insurer argued that the crane operator was responsible for the accident, so it should not pay because the steel company's policy excluded conduct by third parties.  *Id.* The *Bellafronte* court held that New Jersey statute required insurance policies to cover loading and unloading from a vehicle, so any provision in a policy that purported to exclude such incident stemming from loading and unloading was void.  *Id.* at 1297.  The same statute also mandated that third parties involved in loading or unloading a vehicle be covered by the policy. *Id.*  This case is on all fours with the case at bar.  Just as the insurance policy in *Bellafronte* covered an accident caused by a third party unloading steel beams from a truck it insured,

6

ICSOP's policy—stripped of its unenforceable exclusions—covers the alleged loss. ICSOP's motion for summary judgment is denied. Lloyds motion for partial summary judgment is granted with respect to the Norbet automobile policy.

### III. Continental Policies

Continental issued two insurance policies at issue in this case. The first was an umbrella liability policy to Ware Industries that named Norbet as an additional insured. This policy piggybacks on the terms of the ICSOP policy to Norbet, but provides excess liability coverage of up to $25 million. Both Lloyds and Continental agree that this policy should be governed by the same state law as the ICSOP policy. As the Court has determined above, the relevant state law is New Jersey state law, and New Jersey state law dictates that the accident at issue here must be covered under an automobile insurance policy.

Continental argues separately, however, that it is not required to pay out on this policy because DCM was not "using" the Norbet truck within the meaning of New Jersey law. But the cases upon which Continental relies do not support its case. When the workers were unloading the Norbet truck, the crane hoisted the studs thirty-two floors until it reached the top of the building and then would lower the studs until they reached the appropriate floor on the other side of the building. (Hickey Dep. 77:2- 78:10.) When the stud fell, it had reached the eighteenth floor of the near side of the building. (*See id.* at 94:9-10.) In other words, the studs had not yet reached a resting place and were still in their initial movement off of the truck.

In *Liberty Mut. Ins. Co. v. Montclair Art Museum*, a case Continental cites, the court observed that New Jersey courts, in defining loading and unloading, had adopted the broader "complete operation" doctrine over the narrower "coming to rest" doctrine. 2006 WL 2465401, at *6 (N.J. App. Div. Aug. 28, 2008). Under the "coming to rest" doctrine, unloading

7

encompasses "only the actual removing or lifting of the article from the motor vehicle up to the moment when the goods which are taken off the motor vehicle actually come to rest and every connection of the motor vehicle with the process of unloading ceases." *Id*. The "complete operation" doctrine, by contrast, encompasses "the entire process involved in moving the goods, from the moment they are given into the insured's possession until they are turned over at the place of destination to the party to whom delivery is to be made." *Id*. "In other words, did the negligent act which caused the injury or is alleged to have caused it constitute a part of the loading or unloading process?" *Cenno v. W. Va. Paper & Pulp Co.*, 262 A.2d 223, 226 (N.J. App. Div. 1970).

In this case, it is clear that under the narrower "coming to rest" doctrine, the steel studs in question had not actually finished moving (*i.e.* come to rest) after their initial movement from the truck. Furthermore, it is equally clear that the alleged negligence here was integral to the unloading process. The Woo complaint, for example, alleges negligence including failing to inspect and using a faulty sling, permitting unsafe hoisting conditions, etc. (Woo Compl. ¶ 58.) These allegations are fairly similar to those in *Bellafronte*, 376 A.2d 1294, discussed above, in which the third-parties were using a magnet to unload the truck and the magnet attracted a steel beam when it should not have, striking an individual. They are not similar to *Cenno*, 262 A.2d 223, the most favorable case that Continental cites. There, the driver of a truck was unloading bales of cardboard held together with metal bands and clips. *Id*. at 225. As he was unloading the truck, the bands and clips came undone, harming the driver. *Id*. He brought suit, alleging that the bands and clips had been improperly manufactured and that his employer had improperly banded the bales of cardboard together. *Id*. These negligent acts were not connected to the loading and unloading process because they had been completed before delivery even began. *Id*.

at 226. Here, the alleged negligent acts took place as the truck was being unloaded. They were therefore part of the unloading process. As discussed above, New Jersey law requires insurers to cover the actions of third parties assisting in the unloading process.

Continental next argues that even if New Jersey law requires New Jersey policies to cover the accident in question, these laws do not apply to the Norbet truck because Norbet leased, rather than owned the tractor portion of the truck. (Continental Opp'n 14.) While Continental does not appear to contest that it covered the Norbet truck, it appears to argue that the New Jersey rules dictating what the policy must cover do not apply to this policy. As Lloyd's correctly points out, however, the New Jersey Supreme Court has held that insurance policies for leased vehicles are also required to cover loading and unloading. *Kennedy*, 688 A.2d at 91. Continental's argument is without merit.

Finally, Continental argues that it is not required to cover the accident because it did not receive timely notice as required by the terms of the policy. Under New Jersey law, however, an excess liability insurance provider may invoke such a notice provision only where it can demonstrate prejudice. *Gazis v. Miller*, 892 A.2d 1277, 1281 (N.J. 2006). Continental makes no argument that it was prejudiced, so it cannot avoid liability on the basis of the notice provision.

Continental also issued a commercial general liability policy to the architect, Adamson, with limits of $5 million Canadian for each occurrence. Lloyds makes no argument that Continental is obliged to pay out on this insurance policy. The policy contains an endorsement that states, "We agree that additional insureds are covered under this policy as required by written contract, but only with respect to operations performed by or on behalf of the Named Insured." (Simpson Decl., Ex. J, 8.) Adamson entered into a written contract with Goldman Sachs naming Goldman Sachs as an additional insured on its policy, but it did not enter any sort

of contract with the other parties.  (Continental Rule 56.1 Stmt, ¶ 2-3.)  No employee of Goldman Sachs was involved in the accident.  Furthermore, there is no evidence that anyone involved in the accident was acting on behalf of Adamson when the accident occurred.  Tishman, as General Contractor, was responsible for the day-to-day construction of the project, and there is no evidence in the record to suggest that Adamson was involved in the unloading of the studs in any way.  To the extent that Adamson was involved, its involvement was merely supervisory, and the Adamson policy specifically excludes liability for Adamson's supervision of the project.  (*Id*., ¶ 26.)  Continental's motion for summary judgment is granted with respect to the Adamson policy; its motion for summary judgment on the Norbet policy is denied, and partial summary judgment is granted in favor of Lloyds.

### IV. Travelers Policy

Travelers issued a policy to CAS for coverage of a "business auto."  (Travelers Mem. 4.)  Travelers states that CAS's only involvement in the accident was that it lent the sling that snapped to DCM.  (Travelers Rule 56.1 Stmt, ¶ 31.)  Lloyds disputes that this was CAS's only involvement, but the depositions upon which Lloyds relies to support this argument reveal that CAS was not physically involved with the unloading of the studs.  (Palmer Decl., Ex. 13, 24-25.)  After reviewing the complaint and Lloyds' memorandum of law in support of its motion for summary judgment, as well as its opposition to Travelers's motion for summary judgment, the Court remains uncertain regarding Lloyds' legal theory that the Travelers policy provides coverage.  Lloyds has not described who acted or why those actions are covered under the Travelers policy.

The Travelers policy provides coverage for bodily injuries arising from the "ownership, maintenance, or use of a covered 'auto.'"  (Travelers Mem. 9; Premisler Decl. Ex. A, 7.)  In

order for Travelers to provide coverage for the actions of CAS or its employees, they must have been using a covered auto. Lloyds appears to argue that the covered auto here is the Norbet truck. (Lloyds Mem. 20.) But Lloyds does not explain how CAS or its employees were using the truck. It does not appear that any CAS employee was anywhere near the Norbet truck at the time of the accident, let alone using it. Conceivably, Lloyds could be arguing that by lending DCM a sling, CAS was using the Norbet truck, but Lloyds does not provide any legal support for such a far-fetched theory. In any event, even if lending the sling did constitute use of the truck, Lloyds still has not adequately demonstrated that Travelers should cover the resulting accident. Under New York law, which both parties agree governs the Travelers policy, "[s]imply sustaining an injury during the unloading process, without any showing of negligent use of the truck, does not invoke liability coverage under the vehicle insurance policy." *ABC, Inc. v. Countrywide Ins. Co.*, 764 N.Y.S.2d 244, 246 (1st Dep't 2003). Lloyds has made absolutely no showing that CAS was negligently using the Norbet truck.

Lloyds also appears to argue that Travelers is obligated to provide coverage for Goldman Sachs and Tishman. (Lloyds Mem. 20.) Nonetheless, Lloyds concedes that the policy covers Goldman Sachs and Tishman "to the extent they are liable for the acts CAS [sic] and its employees." (*Id*.) Lloyds has made no showing that Goldman Sachs and Tishman are liable for the acts of CAS or its employees. Travelers' motion for summary judgment is granted, and Lloyds motion for partial summary judgment with respect to the Travelers policy is denied.

### V. Hartford Policy

Hartford issued an automobile insurance policy to DCM, the steel erector who was unloading Norbet's truck at the time of the accident. Lloyds appears to argue that Hartford must pay out on this policy because the policy included coverage of DCM's crane. Hartford contests

that the policy covered the crane. The Hartford policy defines "auto" to mean "a land motor vehicle, 'trailer' or semitrailer designed for travel on public roads but does not include 'mobile equipment.'" (Calabria Decl., Ex. H-2, 30.) DCM was using a tower crane that was capable of hoisting steel studs at least as high as eighteen stories. (*See* Lloyds Mem., 4.) According to a witness, it was built into the building, not a free-moving vehicle. (Calabria Decl., Ex. AA, 3.) Such machinery is not a land motor vehicle or trailer designed for travel on public roads. Therefore, an accident involving use of the crane is not covered under the Hartford auto policy.

Lloyds may also be arguing that DCM was using the Norbet auto within the meaning of the Hartford policy. Such an argument is unavailing. As described above, under New York law, a party must demonstrate that an unloading accident was connected to the "negligent use" of a motor vehicle for that accident to be covered under an auto policy. *ABC, Inc.*, 764 N.Y.S.2d at 246. Lloyds has made no showing that the accident resulted from the negligent use of an auto, and as Hartford points out the Woo and Rocco complaints are devoid of any such allegations. (Hartford Opp'n 5-6.) Further, even if this accident had resulted from DCM's negligent use of the Norbet truck, the Hartford policy would not cover the accident. The policy excludes from coverage, "'Bodily injury' or 'property damage' resulting from the movement of property by a mechanical device (other than a handtruck) unless the device is also attached to the covered 'auto.'" (Hartford Rule 56.1 Stmt, ¶ 14.) These exclusions are enforceable under New York law. *Redland Select Ins. Co. v. Washington*, 2010 WL 2854440, at *2-*3 (W.D.N.Y. July 19, 2010). The parties agree that the crane that DCM used to unload the Norbet truck was not attached to the truck. The accident was therefore not covered under the policy.[1] Hartford's

---

[1] Lloyd's argues that the court should adopt a narrow construction of the term "resulting from" that would exclude this accident because the snapped sling caused the accident in addition to the act of unloading. Any accident will

motion for summary judgment is granted, and Lloyds cross-motion for summary judgment is denied.

### VI. Arch Policies

Arch issued two policies to DCM. Arch issued a primary general liability policy to DCM that provides coverage for liability of the sort at issue here. But the policy includes a special endorsement that reads as follows:

> This insurance does not apply to any claim, "suit," demand or loss that alleges "bodily injury," "property damage," or "personal and advertising injury" that in any way, in whole or in part, arises out of, relates to, or results from any wrap-up, owner controlled insurance program, contractor controlled insurance program, or similar rating or consolidated program.

(De Filippis Decl., Ex. D, 47.) Arch argues and Lloyds does not dispute that DCM was enrolled as an insured in the Lloyds policy and that the Lloyds policy covers the injuries suffered by Woo and Rocco. (Arch Mem. 17; Lloyds Opp'n 14-16.) It is apparent that the Arch primary policy does not provide coverage for the accident because the Lloyds policy provides coverage instead.

Arch also issued an umbrella policy that provides excess liability coverage to DCM. Lloyds argues this policy provides excess liability coverage for both the Hartford auto policy and the Arch primary liability policy. With regards to auto insurance, the Arch umbrella policy incorporates the terms of the Hartford/DCM policy. (De Filippis Decl., Ex. E, 9.) For the same reasons that the Hartford policy does not cover this accident, the Arch policy does not cover it, either.

Lloyds also argues that the umbrella policy provides excess coverage for the Arch primary liability policy. It argues that the umbrella policy contains a more narrow exclusion than

---

have several proximate causes. It is unreasonable to limit the terms of the policy to only those situations where there is only one proximate cause.

the primary liability policy for instances when another insurance policy could apply. It bases this argument on a slight variation in the terms of the special endorsement that the umbrella policy contains. Whereas the primary policy contains an exclusion when "any wrap-up, owner controlled insurance program, contractor controlled insurance program, or similar rating or consolidated program" applies (De Filippis Decl., Ex. D, 47), the exclusion in the umbrella policy extends to "a wrap-up or any consolidated insurance program" (De Filippis Decl., Ex. D, 40.) Arch argues that the terms "wrap-up policy" and "owner controlled insurance program" are synonymous, citing *KSW Mech. Servs., Inc. v. Am. Protection Ins. Co.*, 835 N.Y.S.2d 703 (N.Y. App. Div. 2d Dep't 2007). It also argues that the contract between Tishman and DCM used the two terms interchangeably. (Arch Reply, 7.) The Court agrees that these two terms are synonymous. The Arch umbrella policy therefore does not provide coverage. Arch's motion for summary judgment is granted, and Lloyds motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, Illinois National's motion for summary judgment [94] is GRANTED. ICSOP's motion for summary judgment [94] is DENIED, and Lloyds motion for partial summary judgment with respect to the ICSOP policy is GRANTED [123]. Continental's motion for summary judgment with respect to the Adamson policy [106] is GRANTED. Continental's motion for summary judgment with respect to the Norbet policy [106] is DENIED, and Lloyds motion for partial summary judgment with respect to the Continental/Norbet policy is GRANTED [123] Travelers' motion for summary judgment [100] is GRANTED, and Lloyds motion for partial summary judgment with respect to the Travelers' policy [123] is DENIED. Hartford's motion for summary judgment [119] is GRANTED, and Lloyds motion for partial summary judgment with respect to Hartford [123] is DENIED. Arch's motion for summary

judgment [106] is GRANTED, and Lloyds motion for partial summary judgment with respect to Arch [123] is DENIED.

**SO ORDERED.**

Dated: New York, New York

February 25, 2011

Richard J. Holwell

United States District Judge