UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYDS OF LONDON, ISSUING POLICY NOS. 509/DL458805 AND 509/DL460005, | ) ) ) ) |
| Plaintiff, | ) |
| -against- | ) ) |
| ILLINOIS NATIONAL INSURANCE CO., INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, CONTINENTAL CASUALTY COMPANY, HARTFORD FIRE INSURANCE COMPANY, TRAVELERS INSURANCE COMPANY, GREAT AMERICAN, ASSURANCE COMPANY, ARCH INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**Civil Action No.: 09-CIV-4418**

_____

_____

**CONTINENTAL CASUALTY COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF PRIORITY OF COVERAGE AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

_____

Christopher R. Carroll, Esq. (CC0300)
Heather E. Simpson, Esq. (HS5659)
CARROLL McNULTY & KULL LLC
570 Lexington Avenue, 8th Floor
New York, New York 10022

Counsel for Defendant
Continental Casualty Company

Dated: September 12, 2014

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 3

    I.    THE UNDERLYING INCIDENT ...................................................... 3

    II.    THE POLICIES ................................................................................. 3

        A.  The OCIP Policies ....................................................................... 3

        B.  The ICSOP Policy ....................................................................... 5

        C.  The Continental Policy ................................................................ 5

    III.    THE UNDERLYING LAWSUITS & SETTLEMENTS ................................. 6

    IV.    DECLARATORY JUDGMENT ACTION ...................................... 7

LEGAL ARGUMENT ........................................................................................ 9

    I.    UNDER NEW YORK OR NEW JERSEY LAW, THE CONTINENTAL
        POLICY IS EXCESS TO THE LLOYDS OCIP POLICY ................................ 9

    II.    BASED ON THE EXPRESS POLICY LANGUAGE AND A
        BALANCING OF THE EQUITIES, CONTINENTAL HAS NO
        OBLIGATION TO CONTRIBUTE TO THE WOO AND ROCCO
        SETTLEMENTS ............................................................................ 10

        A.  The Policy Language .................................................................. 11

        B.  The Premiums and the Equities ................................................. 13

    III.    IN THE ALTERNATIVE, THE WOO AND ROCCO SETTLEMENTS
        MUST BE ALLOCATED ACCORDING TO THE RESPECTIVE
        DEGREES OF RISK ASSUMED BY THE OCIP COVERAGE AND
        THE NORBET COVERAGE ....................................................... 16

CONCLUSION .................................................................................................. 18

**TABLE OF AUTHORITIES**

**Cases** **Page**

Carter-Wallace, Inc. v. Admiral Insurance Co., 712 A.2d 1116 (N.J. 1998) .......................16, 17

Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co., 147 A.2d 529 (N.J. 1959)..................... 10

Ins. Co. of N. Am. v. Liberty Mut. Ins. Co., 1994 WL 150818
    (S.D.N.Y. Apr. 19, 1994)................................................................................... 13

Owens-Illinois v. United States Insurance Co., 650 A.2d 974 (N.J. 1994) ............................... 16

Pecker Iron Works of New York, Inc. v. Travelers Insurance Co., 99 N.Y.2d
    391 (2003)....................................................................................................... 11

Royal Ins. Co. v. Wausau Ins. Co., 1994 WL 879846 (Mass. Super. Ct. July 1, 1994)........... 15

Safeway Enviro. Corp. v. Am. Safety Ins. Co., 2010 WL 331693
    (S.D.N.Y. 2010)............................................................................................... 15

Sport Rock Int'l, Inc. v. Am. Cas. Co. of Reading, Pa., 878 N.Y.S.2d 339
    (1st Dep't 2009) ............................................................................................. 10

State Farm Fire & Cas. Co. v. LiMauro, 65 N.Y.2d 369 (1985)…………………………….. 11, 13

Universal Underwriters Ins. Co. v. CNA Ins. Co., 706 A.2d 217
    (N.J. App. Div. 1998)…………………………………………………………………… 13

Zurich Am. Ins. Co. v. Penn. Mfrs. Ass'n Ins. Co., 2003 WL 23095605
    (N.J. App. Div. 2003)....................................................................................... 15

**Miscellaneous**

Caroline W. Spangenberg, OWNER CONTROLLED INSURANCE PROGRAMS
    (OCIPs) AND WRAP INSURANCE POLICIES UPDATE, Insurance in the
    Construction Industry Seminar, March 2014........................................................ 13

Glossary of Insurance & Risk Management Terms, IRMI Online (2014) ................................ 13

## PRELIMINARY STATEMENT

Continental Casualty Company ("Continental") submits this memorandum of law in opposition to Plaintiff Certain Underwriters at Lloyd's of London ("Lloyds") Motion for Partial Summary Judgment and in support of its own Cross-Motion for Summary Judgment regarding the priority of coverage for two underlying personal injury settlements.  Lloyds issued insurance policies to Goldman Sachs in connection with the construction of a new headquarters in Manhattan as part of an owner-controlled insurance program ("OCIP").  The OCIP policies were expressly intended to provide broad coverage for the project owner, construction managers, contractors and subcontractors at the site, with the aim of eliminating insurance costs from the contractors' bids and avoiding later disputes over coverage for worksite accidents.  Lloyds received more than $3.36 million in premiums from Goldman Sachs to provide $25 million in OCIP coverage.

After having been called upon to respond to two claims arising from an accident at the site (the precise risk it undertook to insure on behalf of the owner and all contractors), Lloyds now seeks to shirk 50% of its obligation and pass it off to Continental.  Continental did not issue a policy to any of the contractors involved at the site or named as defendants in the underlying lawsuits.  Instead, Continental issued a $25 million umbrella liability policy to Norbet Trucking ("Norbet"), an entity that was responsible only for delivering a load of steel beams to the site.

Pursuant to the plain terms of its policy, the coverage provided by Continental is excess to any and all other insurance available to the insured.  By contrast, the Lloyds policies expressly state that they apply on a primary basis where required by contract.  Here, the underlying contracts entered into between Goldman Sachs and its contractors identify the OCIP as the sole source of insurance coverage for any on-site liabilities.  Indeed, the contractors had no obligation

to procure their own general liability insurance for such exposure.  As the only contemplated source of insurance for on-site operations, there can be no dispute that the OCIP policies were required to apply on a primary basis.  Accordingly, comparison of the other insurance clauses in the policies reveals that they are not mutually repugnant as suggested by Lloyds, but can be enforced as written so as to render the Continental policy excess to the Lloyds policies.

In addition to the policy language, a balancing of the equities further supports Continental's status as the excess carrier.  Although Continental and Lloyds both provided $25 million in limits, Lloyds received *eight times* the amount of premiums received by Continental.  Whereas Continental calculated its premiums based solely on Norbet's potential exposure, Lloyds calculated its premiums based on the potential exposure for any and all contractors at the Project.  Lloyds specifically contemplated that the OCIP would serve as the primary—and sole—source of insurance for accidents that occurred at the work site.  To permit Lloyds to accept substantial premiums to provide OCIP coverage for worksite liabilities but then offload 50% of that obligation to a carrier of a entity that had absolutely no liability for the underlying accident would yield an absurd and inequitable result that is contrary to the laws of both New York and New Jersey.

Based on the unambiguous language of the policies as well as the relevant equitable considerations, the Continental umbrella policy must be deemed excess to the Lloyds OCIP policies.  Since both of the underlying settlements have been paid in full within the limits of the Lloyds OCIP policies, Continental has no obligation to contribute to the settlements.  Therefore, summary judgment should be granted in favor of Continental, and Continental should be dismissed from this case.  Alternatively, in the event this Court determines that Continental and Lloyds are co-insurers on the excess layer, the apportionment of the underlying settlements must

take into consideration the total limits for their respective towers of insurance—$102 million under the OCIP and $26 million under Norbet's liability coverage—resulting in an allocation to Continental of no greater than 20% of the underlying settlements.

## FACTUAL BACKGROUND

### I.    THE UNDERLYING INCIDENT

Goldman Sachs was the owner of a project to construct a new headquarters located in New York (the "Project").  Tishman served as the general contractor for the Project, and DCM and CAS were contractors.  Continental's insured, Norbet, was hired to transport metal studs to the Project.  On December 14, 2007, Norbet's employee, Wilbert Rocco, delivered the metal studs to the Project site in a flatbed trailer.  While the metal studs were being transported with a crane by DCM employees, the nylon sling provided by CAS broke, causing the studs to fall from the crane.

Robert Woo was sitting in a trailer at the Project site when the studs fell from the crane onto the trailer.  Wilbert Rocco was sitting in the cab of his truck at the time the studs allegedly fell onto the flatbed trailer attached to the cab.  Woo and Rocco alleged injuries as result of the crane accident.

### II.    THE POLICIES

#### A.    The OCIP Policies

As is common with large construction projects, Goldman Sachs elected to insure the Project under a single insurance program—an OCIP—to provide coverage for itself, the construction and project managers, the contractors and the subcontractors.  (Simpson Cert., Ex. A at 1, OCIP Manual).  In exchange for Goldman Sachs procuring an OCIP for the benefit of the

contractors, the contractors in turn were required to remove any insurance premium costs from their respective bids for the Project.  (Id.)

Goldman Sachs obtained OCIP coverage from a variety of insurers.  First, Illinois National Insurance Company ("Illinois National") issued a commercial general liability policy providing limits of $2 million per occurrence.  (Id. at 26.)  Above the Illinois National policy, Lloyds provided the next layer of coverage pursuant to two separate policy numbers—509/DL458805 and 509/DL460005—providing limits of $25 million per occurrence (the "Lloyds OCIP Policies").  (Ex. B & B, Lloyds Policies.)  The minimum premium for the Lloyds Policies was $3,362,500.  (Ex. B at UND 00457-458; Ex. C at Endt. 2.)  Notably, however, Lloyds was entitled to recoup additional premiums from Goldman Sachs in the event that the ultimate contract value for the Project exceeded the anticipated contract price.  (Id.)

Goldman Sachs also procured $75 million in additional OCIP coverage as follows:

- XL Europe Ltd. issued a policy providing $25 million in coverage excess of $25 million;

- Lexington Insurance Company issued a policy providing $25 million in coverage excess of $50 million; and

- XL USA issued a policy providing $25 million in coverage excess of $75 million.

(Ex. A at 27.)  Overall, Goldman Sachs maintained $102 million in Project-specific coverage for potential liabilities arising from work at the site.

The four entities for which Lloyds seeks insurance in this action—Goldman Sachs, Tishman, DCM and CAS—all qualified as "Enrolled Parties" under the Lloyds OCIP Policies (in fact, it was mandatory that they enrolled).   (Ex. A; Ex. D-E.)  As such, these entities were afforded full coverage by way of the OCIP and were required to procure their own

general/umbrella liability insurance only with respect to off-site operations that were not otherwise covered by the OCIP. (Ex. D at E-8; Ex. E at E-8.)

### B.    The ICSOP Policy

ICSOP issued a truckers' liability policy providing coverage to Norbet for the policy period March 31, 2007 through March 31, 2008 with limits of $1 million per accident (the "ICSOP Policy"). (Pl. Ex. B.)

### C.    The Continental Policy

Continental issued a commercial umbrella liability policy providing coverage to Norbet for the period March 31, 2007 through July 1, 2008 with limits of $25 million (the "Continental Policy"). The Continental Policy provides coverage in excess of any "scheduled underlying insurance" and any "unscheduled underlying insurance." (Simpson Cert., Ex. F at CCC 00020.) The Continental Policy identifies the ICSOP Policy, providing $1 million in coverage, as "scheduled underlying insurance." (Id. at CCC 00006.) The term "unscheduled underlying insurance" is defined as follows:

> **20.    "Unscheduled underlying insurance"**
>
> a.    "Unscheduled underlying insurance" means insurance policies available to an insured, whether:
>
> (1)    Primary;
> (2)    Excess;
> (3)    Excess-contingent; or
> (4)    Otherwise;
>
> except the policies listed in the Schedule of Underlying Insurance.
>
> b.    "Unscheduled underlying insurance" does not include insurance purchased specifically to be excess of this policy.

5

(Id. at CCC 00033.)  Accordingly, pursuant to the Insuring Agreement of the Continental Policy, Continental has no obligation to make any payment on behalf of an insured until both the "scheduled underlying insurance" and "unscheduled underlying insurance" are fully exhausted. (Id. at CCC 00020.)

The status of the Continental Policy as a true excess policy is further confirmed by way of the "other insurance" provision:

> **4.    Other Insurance**
>
> This insurance is excess over and will not contribute with any other insurance available to the insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.  This condition does not apply to insurance purchased specifically to apply in excess of this insurance.

(Id. at CCC 00028.)  Pursuant to the other insurance provision, Continental will have no obligation to make any payment under the policy until all other insurance—whether primary, excess or otherwise—has been exhausted.

## III.    THE UNDERLYING LAWSUITS & SETTLEMENTS

On or about September 16, 2008 and January 8, 2009, respectively, Woo and Rocco commenced lawsuits in the Supreme Court of New York against Goldman Sachs, Tishman, DCM and CAS, among others, seeking damages for their alleged bodily injuries.  Norbet was not named as a defendant in the Woo or Rocco Actions.

Goldman Sachs, Tishman, DCM and CAS were defended in the Woo and Rocco Actions under the OCIP policy issued by Illinois National.  Continental was never notified of the claims until over a year after the accident, when Lloyds (but not any of the purported insureds themselves) demanded that Continental contribute to a settlement of the Woo Action.

Ultimately, Lloyds paid $17.85 million towards the Woo settlement and $2 million towards the Rocco settlement.

## IV.    DECLARATORY JUDGMENT ACTION

In May 2009, Lloyds commenced the current declaratory judgment action against Continental, ICSOP and five other insurers seeking coverage for the Woo Action and the Rocco Action.  On motions for summary judgment, ICSOP, Continental, Hartford (DCM's insurer) and Travelers (CAS's insurer) asserted that there was no coverage under their policies under New York law because Goldman Sachs, Tishman, DCM and CAS were not permissive users of autos covered under their policies and/or that the "mechanical device" exclusion precluded coverage in any event.  Lloyds contested the application of New York law to the ICSOP and Continental policies and, instead, asserted that New Jersey law controlled.

On March 3, 2011, this Court entered a Memorandum Opinion and Order on the parties' cross-motions for summary judgment.  (Pl. Ex. A.)  The Court concluded that New Jersey law applied to the ICSOP Policy and the Continental Policy, but that New York law applied to the remaining policies at issue in the lawsuit.  Thus, the Court granted summary judgment to Hartford and Travelers, finding no coverage obligation under New York law under the policies issued to DCM and CAS, two defendants in the underlying actions who were directly involved in the accident.  Conversely, this Court construed identical policy language in the ICSOP/Continental policies under New Jersey law and found a coverage obligation.  As such, ICSOP and Continental, the carriers that insured an entity (Norbet) with absolutely no involvement or liability in the underlying lawsuits, are the only carriers that may potentially be called upon to reimburse Lloyds (the project-specific OCIP insurer) for an accident that occurred at the Project.

Continental's Motion for Reconsideration of the summary judgment ruling was denied, however, this Court granted certification for interlocutory appellate review pursuant to §1292(b). The United States Court of Appeals for the Second Circuit granted Continental's petition for leave to appeal but ultimately affirmed this Court's decision on choice of law.

As this Court is aware from recent status conferences, there are several remaining issues that must be resolved before any determination can be made as to Lloyds' entitlement to reimbursement, if any. The threshold legal issue for determination is the "priority of coverage" amongst the potentially implicated policies—Lloyds, ICSOP and Continental. The parties agree this is a legal issue and, therefore, submit the current summary judgment motions to resolve the issue. In the event this Court agrees with Continental's position that its policy is excess over the policies issued by Lloyds, the case effectively is over and there is no need for additional discovery.[1] In the event this Court agrees with Lloyds that the Lloyds and Continental policies must share in the funding of the two underlying settlements, the parties must then engage in additional discovery as to the issue of apportionment of liability among the underlying defendants to determine which portion of the settlement is arguably covered under the Continental Policy.[2]

---

[1] Continental acknowledges that there is an outstanding issue as to what portion of the underlying defense costs, if any, may be owed by ICSOP. That issue does not pertain to the dispute between Continental and Lloyds.

[2] In particular, Lloyds settled the underlying claims on behalf of Goldman Sachs, Tishman, DCM, CAS and three other entities involved in the project for which Lloyds did **not** seek coverage from Continental (Battery Park City Authority, Total Safety, and Regional Scaffolding). (Document 124-33.) Continental's obligations, as determined by this Court under New Jersey law, extend only to entities that constitute permissive users of the truck by way of their involvement in the unloading of the vehicle. Thus, there must be an apportionment of the underlying settlement amounts among the parties that were using the truck (covered under the Continental policy) and parties that were not using the truck (not covered under the Continental policy).

## LEGAL ARGUMENT

I.     **UNDER NEW YORK OR NEW JERSEY LAW, THE CONTINENTAL POLICY IS EXCESS TO THE LLOYDS OCIP POLICY**

Somewhat ironically, Lloyds contends that New York substantive law governs the determination of the priority of coverage amongst the ICSOP Policy, the Continental Policy and the Lloyds OCIP Policies. Yet, Lloyds spent the better part of the past five years seeking to convince this Court and the Second Circuit Court of Appeals above it that New Jersey substantive law applied to the ICSOP and Continental policies. Having successfully obtained a finding that New Jersey law governs the ICSOP and Continental policies, Lloyds now asserts that New York law controls the issue of priority of coverage between the three policies.

In advocating for the application of New York law here, Lloyds identifies the very same factors that Continental relied upon in arguing that New York law governed its policy—namely, that the underlying project and accident were located in New York, the underlying litigation was venued in New York, and the parties allegedly entitled to coverage under the Continental Policy are headquartered or domiciled in New York (*i.e.*, Goldman Sachs, Tishman, DCM and CAS). That said, this Court concluded that New Jersey law applied to the ICSOP and Continental policies because they were issued to an insured (Norbet) principally located in New Jersey.

By way of the current motion, this Court is asked upon to determine the priority of coverage between two policies governed by New Jersey law and one policy governed by New York law. Continental asserts that, under either state's law, the Continental Policy is excess to the Lloyds Policy. Therefore, Continental has no obligation to contribute to the underlying settlements and should be dismissed from this lawsuit.

## II.    BASED ON THE EXPRESS POLICY LANGUAGE AND A BALANCING OF THE EQUITIES, CONTINENTAL HAS NO OBLIGATION TO CONTRIBUTE TO THE WOO AND ROCCO SETTLEMENTS

The Continental Policy is an umbrella policy that cannot be called upon to pay a loss until all scheduled and unscheduled underlying insurance has been exhausted.  There is no dispute that the ICSOP Policy is scheduled underlying insurance and that ICSOP's coverage is primary to the coverage provided by the Continental Policy.  The real issue in dispute here is the relationship between the Continental Policy and Lloyds OCIP Policies.  Based on the express language of the respective policies, and considering the equities (as this Court must), Continental's umbrella policy issued to Norbet must be deemed excess over the Lloyds OCIP Policies, which were specifically intended to provide coverage for on-site injuries such as those allegedly sustained by Mr. Woo and Mr. Rocco.

Where the same risk is covered by two or more policies, courts first will compare the "other insurance" clauses in the respective policies.  Sport Rock Int'l, Inc. v. Am. Cas. Co. of Reading, Pa., 878 N.Y.S.2d 339, 344 (1st Dep't 2009); Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co., 147 A.2d 529, 532 (N.J. 1959).  Here, the other insurance provisions in the Continental and Lloyds policies state as follows:

| Continental | Lloyds |
|---|---|
| This insurance is excess over and will not contribute with any other insurance available to the insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.  This condition does not apply to insurance purchased specifically to apply in excess of this insurance. | If there is any other collectible insurance available to the Insured (whether such insurance is to be primary, contributing, excess or contingent) that covers a loss that is also covered by this policy, the insurance provided by the policy will apply in excess of, and shall not contribute with such insurance, unless a contract specifically requires that this insurance be primary and non-contributory. |

10

Lloyds asserts that both policies contain excess other insurance clauses that purport to render their coverage excess to any other collectible insurance. Thus, Lloyds suggests that the provisions cancel each other out and that Lloyds and Continental should contribute to the underlying settlements on a pro rata basis in proportion to their limits. See State Farm Fire & Cas. Co. v. LiMauro, 65 N.Y.2d 369, 374 (1985). While this proposition is generally true, the Court of Appeals expressly has noted that such a rule is "inapplicable when its use would distort the meaning of the terms of the policies involved." Id. Indeed, it is also necessary to consider "the purpose each policy was intended to serve as evidenced by both its stated coverage and the premium paid for it." Id. We address both the policy language and the equities in turn.

A.    **The Policy Language**

Lloyds' contention that the other insurance clauses in the policies are "virtually identical" ignores one critical distinction. Whereas the Continental Policy states that it is excess to ***any other*** available insurance (without exception), the Lloyds OCIP Policies contain an express caveat to excess status. In particular, the Lloyds OCIP Policies purport to be excess "unless a contract specifically requires that this insurance be primary and non-contributory."

In Pecker Iron Works of New York, Inc. v. Travelers Insurance Co., 99 N.Y.2d 391, 392-93 (2003), the Court of Appeals considered whether a general contractor was entitled to primary additional insured coverage under its subcontractor's policy. Similar to Lloyds' other insurance clause, the additional insured endorsement stated that coverage would be excess "unless [the named insured] had agreed in a written contract for this insurance to apply on a primary or contributory basis." Id. at 393. The court considered the underlying contract and concluded that it required the additional insurance to apply on a primary basis. Id. at 394 ("Pursuant to the policy provision at issue, Travelers agreed to provide primary insurance to any party with whom

11

Upfront had contracted in writing for insurance to apply on a primary basis.  When Upfront agreed to it, the policy provision was satisfied.").

Here, Goldman Sachs (the named insured under the Lloyds OCIP Policies) specifically contracted to procure broad coverage on behalf of all of the Enrolled Parties at the Project, including Tishman, DCM and CAS.  This OCIP provided $102 million in liability coverage and was intended to be a "single insurance program that insure[d] the Owner, Project Manager, Construction Managers, Insured (enrolled) Contractors and their Insured (enrolled) Subcontractors of any tier, along with their eligible Employees and other designated parties for Work performed at the Project Site."  (Ex. A at 1.)

Both the OCIP Manual and the Insurance Rider appended to the contracts with the contractors required the Enrolled Parties to remove any insurance premium costs from their bids for work at the Project.  (Ex. A at 1; Ex. D at E-6; Ex. E at E-6.)  In exchange for giving up their right to recover those costs, the Enrolled Parties were absolved of any obligation under the contract to procure their own general liability or umbrella liability coverage for on-site operations.   Instead, their insurance procurement obligations were limited to general/umbrella liability "for operations away from the Project Site and which are not otherwise insured under the OCIP."  (Ex. D & E at E-8.)

Accordingly, pursuant to the terms of the contracts between Goldman Sachs and DCM and CAS, the OCIP was expressly intended to be the primary—and exclusive—source of insurance for any accident occurring at the Project site.  It is undisputed that the accident giving rise to the Woo and Rocco settlements took place at the Project site during normal operations. Because the plain terms of the underlying contracts require the OCIP to be primary and non-contributory, the exception to the Lloyds other insurance provision is triggered.  Thus, both other

12

insurance clauses can be enforced as written, thereby rendering the Lloyds OCIP Policies primary to the Continental Policy.  See Universal Underwriters Ins. Co. v. CNA Ins. Co., 706 A.2d 217, 220 (N.J. App. Div. 1998) (finding that other insurance clauses were not mutually repugnant where they could both be enforced as written).  Such a result comports with the intentions of the parties and the express terms of their policies.

### B.      The Premiums and the Equities

Although a comparison of the policy language is a threshold inquiry in addressing priority of insurance, it is also critical to consider the purpose each policy was intended to serve as well as the premium paid for it.  See LiMauro, 65 N.Y.2d at 374; Universal Underwriters, 706 A.2d at 220 (noting equitable approach taken by New Jersey courts).  Indeed, "premium size may be an important factor in determining priority of coverage."  Ins. Co. of N. Am. v. Liberty Mut. Ins. Co., 1994 WL 150818, at *3 (S.D.N.Y. Apr. 19, 1994).

OCIPs are intended to offer a consolidated insurance program for a project and to provide "greater control of the scope of coverage, potentially lower project insurance costs, and reduced litigation" by covering all participants in one program.  See Glossary of Insurance & Risk Management Terms, IRMI Online (2014); Caroline W. Spangenberg, Owner CONTROLLED INSURANCE PROGRAMS (OCIPs) AN Wrap INSURANCE POLICIES UPDATE, Insurance in the Construction Industry Seminar, March 2014 ("[W]ith a CIP, there should be less litigation among contract participants.  If the same policy insuring all of them responds to the loss, there should be no need to allocate fault.  This has been touted as one of the distinct advantages of a CIP.").

Bearing these salutary purposes in mind, the Lloyds OCIP Policies were intended to provide liability coverage for all participants, on a primary and exclusive basis, without the need

for additional insured tenders and in-fighting among contractors and insurers for a particular on-site loss.  When it issued the OCIP coverage, Lloyds understood the broad scope of its undertaking and charged Goldman Sachs for a correspondingly substantial premium.  The Lloyds OCIP Policies required a minimum premium deposit of $3,362,500, which could be increased in the event the final contract price exceeded the estimated amount.  (Ex. B at UND00458; Ex. C at Endt. 2.)  In other words, Goldman Sachs' premium for the Lloyds OCIP Policies was over 13% of the total $25 million limit actually provided under the policies.[3]

By contrast, the Continental Policy provided the same $25 million amount of coverage but at a fraction of the premium—$425,826.  Those premium dollars accounted for approximately 1/8 of the Lloyds' premiums and approximately 1.7% of the total limit provided under the Continental Policy.  Moreover, the calculation of the premium for the Continental Policy was based upon the named insureds' potential exposure (Norbet and related companies).  Unlike Lloyds, which specifically contemplated underwriting the exposure of each and every enrolled participant at the Project, Continental had no basis to assess the potential liability of Goldman Sachs, Tishman, DCM and/or CAS at the Project.  Given that these entities had no obligation under their contracts to procure umbrella liability insurance in their own right, it would be an absurd and inequitable result to saddle Norbet—a party that merely delivered a load of steel beams to the site and who has zero liability for the underlying settlements—with the obligation to procure such insurance to cover their liabilities for an on-site accident (the express risk intended to be covered exclusively by the OCIP).

---

[3] Continental notes that, while Lloyds treats its policies as constituting a single $25 million layer within the OCIP, there are technically two policy numbers specifying $25 million limits.  To the extent Lloyds OCIP Policies actually provide two separate $25 million limits, Lloyds' share of the underlying settlements (under Lloyds' pro rata analysis) would be twice as large as Continental's.

Although the issue has not been well-developed in the case law, courts generally acknowledge that OCIPs provide primary coverage for accidents occurring on-site rather than contractors' own liability policies.  See Safeway Enviro. Corp. v. Am. Safety Ins. Co., 2010 WL 331693, at *4 (S.D.N.Y. 2010 (explaining that OCIP "shielded" contractor's general liability carrier from any coverage obligation arising from project); Zurich Am. Ins. Co. v. Penn. Mfrs. Ass'n Ins. Co., 2003 WL 23095605, at *11 (N.J. App. Div. 2003) (concluding that other insurance clauses in OCIP and general liability policy were not mutually repugnant where latter only provided coverage for off-site operations); Royal Ins. Co. v. Wausau Ins. Co., 1994 WL 879846 (Mass. Super. Ct. July 1, 1994) (finding policy language and parol evidence to support primacy of OCIP policy and excess status of contractor's general liability policy).[4]

In its current motion, Lloyds asks this Court to hold Continental responsible for 50% of an obligation it expressly and exclusively underwrote by way of the Lloyds OCIP Policies and for which it was handsomely compensated.  Indeed, this entire declaratory judgment action is the precise type of litigation intended to be avoided by procuring an OCIP policy.  Rather than acknowledge its obligation for the Woo and Rocco settlements (for which it obtained at least $3.36 million in premiums from Goldman Sachs), Lloyds seeks to inequitably transfer half of that obligation to Continental under a policy issued to an entity that had absolutely no liability for the underlying accident whatsoever.

Continental submits that a comparison of the other insurance provisions in the policies requires a finding that the Continental Policy provides coverage in excess of the Lloyds OCIP

---

[4] Lloyds passing reference that Continental might be primary to Lloyds because it is an umbrella policy that potentially "drops down" to provide primary coverage in certain circumstances is a red herring.  The Continental Policy applies in excess of scheduled and unscheduled underlying insurance.  The Court has ruled that coverage exists under the scheduled underlying insurance issued by ICSOP such that there is no drop down issue.  ICSOP is the primary carrier for Norbet.  Thus, under no circumstance can the Continental Policy be deemed primary to the Lloyds OCIP Policies.

Policies.  In addition, to require Continental to contribute 50% to the underlying settlements would "distort the meaning" of the policies and ignore the intent of each policy and the substantial disparity in the premiums charged.  Thus, whether by way of the policy language, the equities or both, Continental is entitled to a judgment declaring it has no obligation to contribute to the underlying settlements, which have been fully funded within Lloyds' layer of coverage.

**III.    IN THE ALTERNATIVE, THE WOO AND ROCCO SETTLEMENTS MUST BE ALLOCATED ACCORDING TO THE RESPECTIVE DEGREES OF RISK ASSUMED BY THE OCIP COVERAGE AND THE NORBET COVERAGE**

For the reasons discussed above, the Continental Policy is excess over the Lloyds OCIP Policies and, therefore, Continental has no obligation to contribute to the Woo or Rocco settlements.   Alternatively, Continental asserts that if there is to be any apportionment between the policies, it must consider not only the Lloyds OCIP Policies, but the entire tower of OCIP coverage procured by Goldman Sachs as compared to the coverage maintained by Norbet.  As noted, Norbet purchased a primary truckers' liability policy from ICSOP with limits of $1 million and umbrella coverage from Continental with limits of $25 million.  Thus, the Norbet "tower" of insurance provides a total of $26 million in coverage.  By contrast, the OCIP "tower" of insurance provides a total of $102 million in coverage.

Courts have recognized the need to consider the degree of risk assumed by a carrier in determining its appropriate share of a loss.  See Owens-Illinois v. United States Insurance Co., 650 A.2d 974, 993 (1994) (holding that loss should be allocated "in proportion to the degree of the risks transferred or retained during the years of exposure" and acknowledging that consideration of total limits was "more consistent with the economic realities of risk retention [and] risk transfer"); Carter-Wallace, Inc., v. Admiral Insurance Co., 712 A.2d 1116 (1998). Under Owens-Illinois and Carter-Wallace, each year of implicated coverage is allocated a

percentage share of a loss based on the total policy limits issued in that year. Such an approach makes "efficient use of available resources" and "promotes simple justice" in allocating a loss among multiple implicated policies. Carter-Wallace, 154 A.2d at 1124. Although the facts of this case involve an instantaneous accident rather than a long-term environmental loss, these basic equitable considerations resonate just the same.

Here, Lloyds intended to assume a far greater risk of exposure than Continental and was compensated for such risk retention with handsome premiums. The Lloyds OCIP Policies were issued as part of a multi-tiered OCIP providing coverage exponentially greater than that issued to Norbet. Thus, to the extent this Court is inclined to attribute any portion of the underlying settlements to Continental, it must take into consideration the "economic realities" presented under the circumstances. Together, the OCIP and Norbet towers of insurance account for $128 million in potentially available coverage. The OCIP tower provides $102 million of the $128 million (80%) and the Norbet tower provides the remaining $25 million (20%). Accordingly, if this Court finds that Continental and Lloyds are co-insurers, the greatest share Continental may bear for the underlying settlements is 20% (after ICSOP's $1 million limits have been deducted). As noted, however, a final determination of the amount owed by Continental (if any) cannot be resolved until further discovery is undertaken as to an allocation of fault among the various entities released by way of the settlements (many of which are not insureds under the Continental Policy).

**<u>CONCLUSION</u>**

For the reasons set forth above, the Continental Policy is excess to the Lloyds OCIP Policies and has no obligation to contribute to the underlying settlements. Therefore, Continental respectfully requests that the Court deny Lloyds' Motion for Partial Summary Judgment and grant summary judgment in favor of Continental.

Respectfully submitted,

Dated: September 12, 2014          CARROLL, McNULTY & KULL LLC
       New York, New York

   __s/ Christopher R. Carroll_____
   Christopher R. Carroll, Esq. (CC0300)
   Heather E. Simpson, Esq. (HS5659)
   Attorneys for Defendant
   Continental Casualty Company
   570 Lexington Avenue, 8th Floor
   New York, New York 10022
   (646) 625-4000

18

## <u>CERTIFICATE OF SERVICE</u>

CHRISTOPHER R. CARROLL, deposes and says that he is over the age of eighteen years and an attorney with the law firm of Carroll, McNulty & Kull LLC, counsel for Defendant Continental Casualty Company.

On the 12th day of September, 2014, deponent states that that service of a true copy of the within document was made via electronic filing upon:

Ira S. Lipsius, Esq.
Lipsius-Benhaim Law,LLP
80-02 Kew Gardens Road, Suite 1030
Kew Gardens, New York 11415
Attorneys for Plaintiff

Anthony J. Zarillo, Jr., Esq.
Bevan, Mosca, Giuditta & Zarillo
200 Madison Avenue, Suite 510
New York, New York 10016
Attorneys for Defendant Illinois National Insurance Company


Dated: September 12, 2014                  ____/s/ Christopher R. Carroll_____
        New York, New York                       Christopher R. Carroll

19