UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYDS OF LONDON, ISSUING POLICY NOS. 509/DL458805 AND 509/DL460005 et al., | ) ) ) ) | **Civil Action No.: 09-CIV-4418** |
| Plaintiff, | ) ) | |
| -against- | ) ) | |
| ILLINOIS NATIONAL INSURANCE CO., INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, CONTINENTAL CASUALTY COMPANY, HARTFORD FIRE INSURANCE COMPANY, TRAVELERS INSURANCE COMPANY, GREAT AMERICAN, ASSURANCE COMPANY, ARCH INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

_____

---

**DEFENDANT CONTINENTAL CASUALTY COMPANY'S
RESPONSE TO PLAINTIFFS' PRE-TRIAL MEMORANDUM**

---

Michael R. Schneider, Esq.
Heather E. Simpson, Esq.
KENNEDYS CMK LLP
570 Lexington Avenue, 8th Floor
New York, New York 10022

Counsel for Defendant
Continental Casualty Company

Dated: June 25, 2019

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................... 1

RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS ............................... 2

    A. THE ACCIDENT ................................................................................. 2

    B. WILBERT ROCCO DELIVERS THE METAL STUDS........................ 3

    C. THE HOIST ........................................................................................ 4

        1.  Riggers v. Ironworkers.................................................................. 4
        2.  Pick Zone Designation................................................................. 4
        3.  Violations ..................................................................................... 6
        4.  Sling Inspections and Load Weight ............................................. 6
        5.  The "Straight-up" Lift.................................................................. 8

    D. THE WORK SITE LAYOUT .............................................................. 9

    E. WORKSITE SAFETY ....................................................................... 10

    F. THE PICK ZONE AND DCM'S HOISTING PROTOCOL.................. 11

    G. POST-ACCIDENT EXAMINATION OF THE NYLON SLING......... 11

    H. CONTINENTAL'S EXPERT, TIMOTHY CARLSEN ....................... 13

ARGUMENT....................................................................................................... 14

    I.      THE PARTIES' RESPECTIVE DUTIES ARE DERIVED
          FROM CONTRACT.................................................................. 14

    II.     THE DOCTRINE OF *RES IPSA LOQUITOR* DOES NOT APPLY ............. 16

          A.  Elements and Burdens........................................................... 16
          B.  Things Can Fall From Cranes Absence Negligence in Hoisting.............. 17
          C.  The Hoisting Activities Were Not Within the Exclusive
              Control of DCM and/or CAS.................................................. 18
          D.  Contributory Negligence By Plaintiff ................................... 20
          E.  Continental Has Rebutted the Negligence of DCM and CAS
              and Presented Evidence of Negligence by Other Parties ........................ 21

## TABLE OF CONTENTS CONT'D.

**Page**

III.   UNDERWRITERS CANNOT ESTABLISH CAUSATION FOR THE FAILURE OF THE SLINGS ............................................................... 23

IV.   COLLATERAL ESTOPPEL DOES NOT PRECLUDE LITIGATION OF THE LIABILITY APPORTIONMENT ISSUE ...................................... 26

CONCLUSION ................................................................................................... 30

CERTIFICATE OF SERVICE ........................................................................... 31

## TABLE OF AUTHORITIES

**Cases**                                                                                                **Page**

Antoniello v. E. 51st St. Dev., 2012 N.Y. Misc. LEXIS 6276
   (Sup. Ct. Jan. 17, 2012) ............................................................................... 27

Bd. of Educ. V. Sargent, Webster Crenshaw & Folley, 71 N.Y.2d 21 (1987)..................... 14

Cappellini v. McCabe Powers Body Co., 713 F.2d 1 (2d Cir. 1983) .................................. 26

Corcoran v. Banner Super Market, Inc., 19 N.Y.2d 425 (1967)………………………..20, 22

Craig Test Boring Co. v. Saudi Arabian Airlines Corp., 138 F. Spp. 2d 553
   (S.D.N.Y. 2001) ............................................................................................. 14

Church v. Callanan Industries, Inc., 99 N.Y.2d 104 (2002)................................................. 15

D'Arata v. N.Y. Cent. Mut. Fire Ins. Co., 76 N.Y.2d 659 (1990)........................................ 28

Derrell v. Nassau Cty. Med. Ctr., 73 A.D.2d 682 (2d Dep't 1979)...................................... 22

Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136 (2002)..................................... 15

Gerney v. Tishman Constr. Corp., 518 N.Y.S.2d 564 (Sup. Ct. 1987)................................ 24

Horowitz v. Keva Konner, Inc., 67 A.D.2d 38 (1st Dep't 1979) ......................................... 22

Jainsinghani v. One Vanderbilt Owner, LLC, 162 A.D.3d 603 (1st Dep't 2018)................ 26

Mendes v. Caristo Constr. Corp., 5 A.D.2d 268 (1st Dep't 1958) ...................................... 24

Notice v. Regent Hotel Corp., 429 N.Y.S.2d 437 (1st Dep't 1980) ..................................... 22

Richard Equip. Corp. v. Manhattan Indus. Contracting Co., 191 N.Y.S.2d 587
   (2d Dep't 1959)............................................................................................... 22

Ryan v. N.Y. Tel. Co., 62 N.Y.2d 494 (1984)...................................................................... 28

Schroeder v. City & Cty. Sav. Bank, 293 N.Y. 370 (1944) ................................................. 20

Schwartz v. pub. Admin of Cty. of Bronx, 24 N.Y.2d 64 (1968) ........................................ 28

Smith v. Moore, 227 A.D.2d 854 (3d Dep't 1996)............................................................... 16

## TABLE OF AUTHORITIES CONT'D.

**Cases**                                                                       **Page**

Stiver v. Good & Fair Carting & Moving, Inc., 9 N.Y.3d 253 (2007) ................................ 15

Toribio v. 575 Broadway LLC, 2018 N.Y. Misc. LEXIS 5576 (N.Y. Sup. Ct. Nov. 21, 2018)………………………………………………………………..26, 28

Verdugo v. Seven Thirty One Ltd. P'ship, 70 A.D.3d 600 (1st Dep't 2010)...................... 29

Weeden v. Armor Elevator Co., 97 A.D.2d 197 (2d Dep't 1983)...................................... 16

**Statutes and Regulations**

Labor Law §240(1), §200 and §241(6) ............................................................................... 22

New York Administrative Code Section 27-1055(g) ......................................................... 6

## PRELIMINARY STATEMENT

Review of the opening pre-trial memoranda reveals the clear divergence in approach between Plaintiffs ("Underwriters") and Continental Casualty Company ("Continental").  By their own admission, Underwriters' case is based upon circumstantial evidence.  Continental's case is based upon actual evidence.  Underwriters contends that the underlying construction contracts setting forth the parties' obligations should be disregarded entirely.  Continental embraces the contract documents as the framework for this Court's analysis.  Underwriters further asserts that this Court is bound by certain regulatory findings that were limited to specific violations under the Building Code.  Continental invites this Court to undertake its own analysis of civil liability based upon the complete record presented by the parties.

It is clear that Underwriters' strategy is to avoid a robust review of the evidentiary record and an actual determination of liability by this Court.  And for good reason.  The evidence reflects that Tishman and its Site Safety Manager, Total Safety, were solely responsible for maintaining all safety precautions at the site and coordinating the work of all trades to ensure a safe and efficient process.  Despite that obligation, and contrary to the site plans, Tishman opted to place an office trailer on top of the sidewalk shed and allowed personnel to remain working in the trailer while hoisting operations were taking place almost directly above it.   In addition, despite being notified **two days before** the accident that better coordination of the trades was necessary and that subcontractors had requested additional overhead protection for unloading trucks at the hoist, Tishman and Total Safety did nothing.  Two days later, a catastrophic accident took place due to the very concerns raised at the safety meeting.

By contrast, Underwriters can point to no direct evidence supporting negligence by DCM and CAS in using the nylon slings on the day of the accident, instead focusing their case upon the doctrine of *res ipsa loquitor*.  Underwriters fails to establish negligence on the part of

DCM and/or CAS by way of *res ipsa* or actual evidence.  Underwriters' position that the slings were unfit for use on the day of the accident is based exclusively upon after-the-fact speculation; there is no testimony or document establishing that the slings appeared unfit for use **prior to** being used on the day of the accident.  Moreover, Underwriters may not rely upon regulatory violations issued to DCM and CAS to establish causation and liability.  In any event, Tishman itself received two regulatory violations, thereby undercutting Underwriters' attempt to place sole responsibility on DCM and/or CAS.

As set forth in Continental's opening brief, DCM and CAS complied with their contractual obligations and acted with reasonable care in carrying out the hoisting activities on the day of the accident.  Tishman and Total Safety did not.  Continental incorporates by reference the detailed discussion of the parties' obligations and conduct from its opening brief and focuses this response upon the misguided legal arguments made by Underwriters.  Underwriters has failed to sustain its burden to shift liability from Goldman Sachs, Tishman and Total Safety to DCM and CAS.  Therefore, Underwriters is solely responsible for the settlements it entered into on behalf of seven defendants in the underlying lawsuits.

<u>**RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS**</u>

Continental set forth a detailed statement of facts in its opening pre-trial memorandum. Although additional facts may be discussed in the argument section of this brief, Continental believes it is most critical to address several inaccurate or misleading "facts" included in Underwriters' opening brief as well as the pertinent facts that were omitted by Underwriters altogether. We address each misstatement or omission below, using the headings as listed in Underwriters' brief.

**A.    <u>The Accident</u>**

Underwriters starts its brief by claiming, as fact, that the nylon slings were "approved for use by DCM." They fail to acknowledge, however, that Tishman also approved the use of

nylon slings, as did Total Safety.  Roger Cettina of Tishman was specifically asked, "Prior to the accident, were you aware that nylon chokers were going to be used to lift the studs rather than chain chokers or steel chokers," and he responded "yes."  See Ex. 61 (Cettina T2) at 95:20-24; Ex. 60 (Cettina T1) at 45:2-5. Mr. Cettina admitted that he approved the use of nylon chokers and that he had no concerns whatsoever about the use of nylon slings.  See Ex. 61 at 96:11-16;  Ex. 60 (Cettina T1) at 48:19-22.  He also admitted to using nylon slings in the past and that it was "not unusual at all" to do so. See Ex. 60 (Cettina T1) at 49:3-11.  In fact, as per a photograph attached to the November 2007 monthly progress report, it is clear that synthetic slings were previously used at this project for the hoisting of other materials. See Ex. 74. Additionally, as noted in Continental's initial brief, Mr. Cettina admitted that both Tishman and Total Safety had an independent responsibility to ensure that the slings were properly inspected before each use. See Ex. 60 (Cettina T1) at 90:3-10.

## B.   WILBERT ROCCO DELIVERS THE METAL STUDS

 In this section, Underwriters downplays the role Tishman and Total Safety played in arranging for this hoist. As noted in Continental's brief, Tishman and Total Safety were well aware that the hoist was taking place, and Tishman actually coordinated the hoisting activities on the day of the accident. See Ex. 61 (Cettina T1) at 74:22-75:6.  Mr. Cettina knew exactly how the steel studs were being hoisted that day, and he was the one who made the decision to hoist the steel in that fashion. Id. at 76:16-79:3; 95:3-15.  Mr. Brehm of Total Safety also knew the hoist was taking place on the day of the accident.  See Ex. 65 (Brehm T1) at 13: 9-14.

Underwriters also asserts that Wilbert Rocco "announced" that he was re-entering the pick zone in order to get a cigar from his truck, likely in an attempt to demonstrate that DCM was aware of, and ignored, Mr. Rocco's "announcement" that he was re-entering the pick zone through the caution tape.  However, there is no evidence to support the claim that an "announcement" was made by Rocco. It is clear from Mr. Rocco's deposition that he was

simply reiterating his state of mind when he mentioned going back to his truck for a cigar, not that he was referring to an actual announcement he made to DCM. See Ex. 63 (Rocco T1) at 25:24-26:13; see also Ex. 73 (Rocco T2) 52:20-53:4; 53:20-54:2; 54:25-56:4; 56:19-57:6.

Further, according to Rocco's testimony, the men with whom he spoke immediately after the accident were **not** from DCM. Meaning, the men who are described in Underwriters' brief as saying "we thought you were standing there" were not from DCM.  See Ex. 63 (Rocco T1) at 39:19-40:24.  Also, Rocco admitted that he knew that DCM had started unloading the truck and hoisting the materials, yet he chose, on his own to ignore the caution tape and re-enter the pick zone to talk on his cell phone and retrieve a cigar. Id. at 26:3-22; 27:10-12; 27:13-18; 28:17- 29:20.

## C.   THE HOIST

### 1.   Riggers v. Ironworkers

Underwriters points out that none of the men who were working as ironworkers were properly trained in rigging. However, the witnesses from DCM did not concede this point, and in fact countered it. While the DCM workers were admittedly not riggers by trade (a fact known to Tishman), as ironworkers they regularly performed rigging on jobs, took safety courses on rigging, and were well versed in doing so.  See Ex. 64 (Horn) at 26:20-23; 27:7-16; 34:9-11; 69:7-11; 141:16-23; Ex. 68 (Hickey) at 33:13-34:2.

There is no evidence that DCM represented to Tishman that its workers were anything other than ironworkers. Thus, if the contention by Underwriters is that a certified rigging trade should have performed the hoisting of CAS's materials, then liability for failing to hire certified riggers would rest with Tishman, not DCM.

### 2.   Pick Zone Designation

In this section and others throughout their brief, Underwriters claims that DCM designated the pick zone. This is a blatant misrepresentation of the testimony.  Mr. Cettina

testified that Tishman designated the pick zone. Specifically, he stated that Tishman prepared the Logistics Plans which delineated the pick zones, and that these were "pre-determined" so DCM "had to live by them."  See Ex. 61 (Cettina T2) at 59:7-15 ; 83:5-84:7; 84:23-85:18 ; 106:3-13 ; 148:5-16 ; 150:5-151:8; Ex. 71 (Carlsen) at 138:18-144:24 ; Ex. 51.  Mr. Cettina admitted that he did not take into account any considerations other than proximity to the crane (e.g., an office trailer worker like Mr. Woo) when designating the pick zones.  See Ex. 61 (Cettina T2) at 85:24-86:4.  This was despite Mr. Cettina having watched many hoists of different materials using this same tower crane prior to the accident. Id. at 86:5-15.  He was admittedly aware of the trailer's close proximity to the pick zone, stating "the pick zone for this crane would have been basically right in front of where these trailers are." Id. at 73:22-. 74:4.  However, the pick zone did ***not*** include the location of the Woo office trailer. See Ex. 60 (Cettina T1) at 72:9-12.

Underwriters claims that DCM did not have anyone responsible to clear the area immediately outside the pick zone, insinuating that this was a dereliction of duties. However, the reason DCM did not have such a person was because Tishman did not require it.  Mr. Cettina specifically testified that he did not require DCM to clear any personnel outside the pick zone, nor to alert people working in the office trailers of hoisting activity because he "obviously" did not give any consideration to falling objects. See Ex. 61 (Cettina T2) at 88:14-25; 89:9-15; 131:18-133:3.  Also, hoisting activities were being performed every day, multiple times throughout each day, for months on end.  See Ex. 56; Ex. 57.  Tishman likely made the decision that it would have been inefficient to require trailer workers to be removed during each hoist because of the interruption it would cause. Once again, Tishman was responsible for coordinating all work activity at the site and chose to place an office trailer in harm's way as opposed to simply moving the workers inside the building as it did after the accident.

### 3. <u>Violations</u>

At page 20 of their brief, Underwriters cites a portion of the ALJ's decision denying DCM's motion to dismiss the DOB violations. Underwriters claims that the ALJ's reasoning supports the notion that the mere use of nylon slings was a violation of the DOB. However, Underwriters is well aware that the ALJ misapplied the language from the New York City Administrative Code. Specifically, there is no prohibition against the use of synthetic slings like the ones used in this situation, as long as they are being used below the hook. Section 27-1055(g) of the New York Administrative Code specifically provides for their use. <u>See</u> Ex. 75. The ALJ's language regarding the need to have a line that is a minimum of ½ inch diameter plow grade steel was simply a misunderstanding of the Administrative Code. The Code's requirement for ½ inch diameter plow grade steel is in reference to the main hoisting line that runs around the drum and performs the lifting – all of which is above the hook. <u>Id.</u> § 27-1055(a).

In our case, there is no question that the nylon slings were attached to the hoisting machinery below the hook, a fact acknowledged in Underwriters' brief. <u>See</u> Und. Br. at 48-49. Thus, Underwriters' contention that the use of nylon slings, in and of itself, was a violation of the Administrative Code should be disregarded entirely. Further, each witness testified that they had used synthetic slings in the past, just that it was not the norm. As noted above, even Cettina admitted that he had used nylon slings in the past, and based on the attached photo, he had permitted their use in a different phase of this project. <u>See</u> Ex. 74.

### 4. <u>Sling Inspections and Load Weight</u>

Underwriters contends that Tishman never viewed the slings before the hoist. This point is made in an effort to demonstrate that Tishman should bear no responsibility for the alleged worn out nature of the slings. However, Tishman admitted that it, and Total Safety, actually had the responsibility to make sure the slings were inspected and safe for use. (Ex. 60, p.90:3-

10) The fact that they did not do so does not absolve them of liability, but rather, supports the conclusion that they were delinquent in performing their duties.

Underwriters cites Ky Horn's deposition testimony in describing the slings as old, insinuating that they were worn and that was a reason for the accident. However, Mr. Horn explained exactly what he meant later in his deposition, saying that he did not believe the slings were worn, just that he described them as old because they were dirty.  See Ex. 64 (Horn) at 116:3-21. Underwriters has pointed to no evidence supporting the theory that the mere age of the slings played a role in the accident.

In regard to the weight of the load on the day of the accident, Underwriters takes many liberties with the testimony. They contend that this was the last load being hoisted ***from the Rocco truck***, arguing that each prior uneventful load was much lighter. There is absolutely no evidence to support either of those conclusions. It is unknown whether the five prior hoists were from the Rocco truck or from other trucks carrying CAS's materials that day as well. Based on the fact that Mr. Rocco testified that the accident happened almost immediately after DCM started offloading his truck, logic would dictate that this could not have been the fifth hoist from his truck. See Ex. 63 (Rocco T1) at 25:3-29:14. As such, there is no way for Underwriters to surmise the weight of the prior loads in comparison to the weight of the load at the time of the accident. In fact, the crane operator, Kevin McPaul, stated that the prior hoists were relatively similar, in terms of weight. He was specifically asked whether the load at the time of the accident was heavier than the earlier loads, and he responded by saying "there were a couple the same," after which he explained that they were relatively "all the same." See Ex.17 at 5.

Further, Underwriters contends that the weight must have been close to 14,000 pounds because that number is referenced in a few witness statements. However, they fail to mention that the 14,000 pounds was inclusive of the machinery itself, meaning the cabling and the ball.

Ed Sinnott of Total Safety specifically stated that the 14,000 pound figure "includes the cabling and the ball, which probably means you're probably into the 10,000 – 11,000 lbs. range on the actual load itself." See Ex. 18 at 3. This was echoed by Mr. Cettina in the post-incident investigation report, who wrote that the total weight of between 14,000 – 15,000 lbs. was "inclusive of the cabling, ball and hook." He went further, explaining that "when the weight of the crane rigging is deducted, the actual weight of the steel stud load was estimated at between 10,000 – 11,000 lbs." See Ex. 59 at 5. This point was even conceded by Underwiters' expert, David Decker, who agreed that Mr. Cettina and the crane operator concluded that the 14,000 lbs. figure included the cabling, ball and hook, meaning the load was far less than that. See Ex. 72 (Decker) at 77:20-80:4.  Using the 10,000 – 11,000 lbs. figure, and even assuming the choke angle set forth in Underwriters' brief, there is no evidence of overloading.

### 5.  The "Straight-up" Lift

Underwriters argues that the lift was supposed to be "straight up" and that the pick zone was sufficient had the lift been performed properly. However, this argument defies logic. As explained by Continental's expert, Timothy Carlsen, when Tishman made the decision to place trailers on the sidewalk shed, they narrowed the available area to lift loads by 11 feet, thereby rendering the pick zone that much closer to the office trailers. See Ex. 31 at 10.  He explained that "placing the trailers on the sidewalk shed placed them squarely within the swing radius of not only the crane load line (at the boom tip angle contemplated in the Tishman Logistics Plans), but most always within the twist radius of long loads, such as the bundled 27-foot-long studs." Id.  He stated that "long loads twist when raised, placing the outer edge of a 27-foot-long load 13-1/2 feet outboard of the center-line of the lifting line. A 27-foot-long load lifted from the truck bed in the Tishman-designated pick zone will twist and extend to above the occupied trailer(s) without any external-induced lateral motion (such as wind)." Id. Thus,

Underwriters' contention that DCM performed the hoist improperly simply because of where the studs fell, has no support in the evidence.

## D.   <u>THE WORK SITE LAYOUT</u>

Underwriters argues that DCM played a role in the decision to place the office trailers on the sidewalk shed. This is not accurate.  DCM merely provided the means to lift the trailers to that location, but played no role in the decision to do so. In fact, when Mr. Cettina was asked if DCM was consulted with regard to placing the trailers on the sidewalk shed, he responded by saying "they physically put the trailers there for us," nothing more.  <u>See</u> Ex. 61 (Cettina T2) at 154:3-8. When Mr. Cettina was asked whose decision it was to place the office trailers in their locations, he said that it was his. <u>Id.</u> at 35:7-10. When asked whether DCM's safety consultant, Pro Safety, was consulted regarding the decision to place the trailers in this location, he said "no." <u>Id.</u> at 155:17-156:9. Additionally, Duane Carter of Tishman testified that it was Mr. Cettina alone who decided to place the trailers in their location at the worksite. See Ex. 69 (Carter) at 18:15-18. As such, there is no merit to Underwriters' contention that DCM played any role in the decision to place the office trailers on the sidewalk shed.

In explaining why he made the decision to place the trailer on the shed, Mr. Cettina began by noting that during the excavation phase, they were not required to have a sidewalk shed. <u>See</u> Ex. 61 (Cettina T2) at 27:5-19. This was likely because there was no threat of pedestrians being struck by falling objects when they were simply excavating. However, once the sidewalk shed was erected (to protect people from falling objects), Tishman decided to place the trailers on top of it because it gave them more space to work. <u>See</u> Ex. 61 (Cettina T2) at 25:19-26:10; 41:17-42:13; 55:7-9; 54:5-16; 144:9-14; 153:8-13.  Mr. Cettina admitted that Tishman made this decision despite the fact that the Logistics Plan did not call for trailers on the sidewalk shed during construction of the building, and despite his acknowledgement that the purpose of the sidewalk shed during the steel erection phase was "to protect pedestrians if

anything falls." See Ex. 61 (Cettina T2) at 41:9-16; 43:17-25; 50:13-17.  Mr. Cettina also admitted that the arc of the crane, per the Logistics Plan, was over the office trailers. See Ex. 61 (Cettina T2) at 57:8-21. Thus, liability for deciding to place Mr. Woo's trailer in harm's way rests with Tishman and Tishman alone.

Lastly, Underwriters points out that the New York City Department of Buildings ("DOB") approved the placement of the trailer on the sidewalk shed as if that supports the notion that Tishman's decision to do so was appropriate. However, Mr. Cettina and Mr. Carter admitted that the DOB permit process was merely to establish that the sidewalk shed could withstand the weight of the trailer, and that Tishman never even advised the DOB of the proximity of the trailer to the pick zone.  See Ex. 61 (Cettina T2) at 169:7-170:9. Mr. Carter stated that he had no idea if the DOB would have considered the proximity to the pick zone when approving the placement of the trailer on the sidewalk shed.  See Ex. 69 (Carter) at 38:8-39:15. Thus, any argument that the DOB approved the placement of the trailer for purposes of overhead protection is misplaced.

### E.    WORKSITE SAFETY

Underwriters contends that Total Safety had no responsibility for supervising DCM's hoisting, but the evidence and deposition testimony totally contradicts that point. Underwriters admits that both Tishman and Total Safety walked the site multiple times every day and looked for safety concerns, but they attempt to minimize that responsibility by claiming it was only with regard to the wearing of hard hats, safety goggles, etc. There is no support in the evidence for this minimization of Tishman's and Total Safety's safety responsibilities. Simply put, both Tishman and Total Safety had their own independent responsibility to make sure the trades were working safely in conjunction with each other, which included walking the site every day to make sure all work was performed safely, including the performance of hoisting activities. See Ex. 52 at Sec. 2.4.1, 2.4.5, 2.4.8, 2.8.1, 2.8.6, 2.9.2; Ex. 69 (Carter) at 13:24-14:5; 15:16-

21;  Ex. 50 at E(c)(7) and p. 25; Ex. 60 (Cettina T1) at 87:12-88:11; Ex. 61 (Cettina T2) at

65:25-66:6, p. 105:9-20.  Thus, even assuming there was a noticeable problem the slings that

should have been recognized in advance, Tishman and Total Safety cannot simply wash their

hands of it by claiming that they relied upon DCM.

**F.**    **THE PICK ZONE AND DCM'S HOISTING PROTOCOL**

As noted above, the testimony is clear that Tishman designated the pick zones and did

not require that the trailers be cleared during hoisting activities.  Underwriters makes the claim

that the Building Code did not require trailers to be vacated during lifts. Notably, they cite no

actual code language on this issue. Instead, they cite deposition testimony from Duane Carter

for this proposition. However, Mr. Carter never made such a proclamation. Instead, he only

testified that he did not know whether the DOB or OSHA had any provisions concerning this

issue. See Ex. 69 (Carter) at 47:6-12. As such, this argument by Underwriters should be

disregarded entirely.

**G.**    **POST-ACCIDENT EXAMINATION OF THE NYLON SLINGS**

Underwriters claims that the slings were noticeably defective prior to their use.

However, Underwriters ignores the fact that no one who saw or used the slings on the day of

the accident agrees with that point. As set forth in Continental's initial brief, each person who

was at the worksite testified that he saw no problems with the slings and that none of the defects

shown in the post-accident photos existed prior to their use. Even the witness who was

employed by Lift-All (the sling manufacturer), Gregory Babinchak, had no idea which of the

purported defects came about after this accident, which ones pre-dated it, and which ones arose

in the month and a half between the time of the accident and his inspection. When questioned

about the various "snags" in the photos, Mr. Babinchak testified that there was only one that

might have pre-dated the accident, and that he "can't definitively say that it was damaged prior

to that date" See Ex. 70 (Babinchak) at 164:20-166:10. For almost every other alleged defect

11

that was depicted in the photos taken a month and a half after the accident, he testified that he did not know when the damage occurred. Id. at 141:3-148:7. Below are specific question/answer exchanges within those pages on the various alleged defects shown in the photos:

Q: Do you have an opinion as to when that condition first came about?

A: No. (141:17-19)

Q: Do you know when that discoloration first came about?

A: No. (142:5-7)

Q: Do you know when that puncture or snag first occurred?

A: No. (145:4-6)

Q: Do you know when that heavy abrasion was first noticeable?

A: No, sir. (145:17-19)

Q: Do you know when that surface abrasion was first noticeable?

A: No, sir. (146:18-20)

Q: Let's just talk about the yarn that's more noticeable in this picture. Was that red yarn, do you know, noticeable on December 14, 2007, prior to the accident?

A: No, sir, I don't. (147:20-148:7)

Also, Underwriters claims that there was evidence of chemical damage to the slings, seeking to support their claim that the slings should not have been used. However, Mr. Babinchak was clear with respect to this allegation, testifying that there was "no confirmation from looking at the webbing that there was indeed chemical damage that [he] could see for sure." Id. at 164:16-19. Also, when asked about specific areas of discoloration on the slings, he answered that he had "no opinion of whether its likely chemical . . . ." Id. at 62:21-63:4.

12

**H.**   **CONTINENTAL'S EXPERT, TIMOTHY CARLSEN**

Underwriters contends that Mr. Carlsen is not qualified to render opinions with regard to the slings, the weight of the load, or the involvement of the crane. In support of this contention, Underwiters cherry-picks portions of his deposition testimony and reaches self-serving conclusions based on that testimony. However, even those cherry-picked portions of his testimony do not support the notion that he is unqualified to render an opinion. They merely establish that he is not a rigger or a crane operator.  Underwriters ignores the fact that Mr. Carlsen, unlike their own expert, is a licensed professional engineer in Pennsylvania and New Jersey, as well as a Certified Safety Professional (CSP), Certified Safety Trained Supervisor of Construction (STSC), Authorized OSHA Construction Safety Trainer (10 and 30 hr courses), and a member of numerous professional societies including ASTM International Committee E-06 on the Performance of Buildings.  See Ex. 32. They also ignore the exhaustive list of courses he has taken to maintain these licenses, as well as the fact that he actually had significant practical experience in performing and supervising hoisting activities. (Ex. 32) Mr. Carlsen testified that he worked in heavy construction for almost a decade as a consulting engineer at various jobs where they lifted tanks, vessels, and structural steel. At these jobs, he explained that rigging safety was part of his job description, and he worked with nylon slings. He also noted that based on the entirety of his experience and training, he has the requisite expertise to opine on the slings, the computation of the load weight, and the involvement, or lack thereof, of the crane in this accident. See Ex. 71 (Carlsen) at 20:18-22:2; .29:8-22; 36:8-37:24;  57:2-58:24.  He further testified that he has performed independent testing of nylon slings in another case. Id. at 156:15-157:2. Thus, there is absolutely no merit to the contention

that Mr. Carlsen is unqualified to render opinions in this case, a point which we will address more fully in opposition to any motions in limine made prior to his trial testimony.

Finally, Underwriters contends that Mr. Carlsen agrees with their main premise – that DCM violated ASME and OSHA standards by using these slings. However, Mr. Carlsen has never made such an admission. Rather, he was asked by Underwriters' counsel merely if the conditions in the photos would warrant discontinuation of their use under ASME, to which he said yes. However, as noted above when discussing Mr. Babinchak's testimony, there is absolutely no way to determine if any of those photographic conditions existed prior to the accident, and most importantly, Mr. Carlsen explained that the ultimate failure had nothing to do with those defects. Id.  at 151:13-156:9. Thus, Underwriters' contention that Mr. Carlsen actually supports their position is untrue.

## ARGUMENT

## I.      THE PARTIES' RESPECTIVE DUTIES ARE DERIVED FROM CONTRACT

Displeased with the broad contractual obligations placed upon Tishman and Total Safety to ensure site safety and coordination of work at the Project, Underwriters makes the unfounded contention that "the contractual obligations between the parties are irrelevant" for purposes of this Court's apportionment of liability.  See Und. Br. at 38.  This statement is not quoted from any case, and the case law relied upon by Underwriters for this general proposition is inapposite.

The cases cited by Underwriters simply address the applicable standards for contribution claims among joint tortfeasors.  See Bd. of Educ. v. Sargent, Webster, Crenshaw & Folley, 71 N.Y.2d 21, 27-28 (1987) (precluding contribution claim by architect against contractor when its liability to the plaintiff was based solely upon economic loss for breach of contract); Craig Test Boring Co. v. Saudi Arabian Airlines Corp., 138 F. Supp. 2d 553, 557-58 (S.D.N.Y. 2001) (applying comparative negligence standard for contribution claim).  These

14

were not Labor Law cases and, in any event, they did not preclude reference to contract documents to address the apportionment of liability among parties.

It is well settled that contractors such as DCM and CAS generally are not liable in tort to a non-contracting party such as Mr. Woo or Mr. Rocco.  See Stiver v. Good & fair Carting & Moving, Inc., 9 N.Y.3d 253 (2007).  Indeed, the general rule under New York law is that "recovery for negligent performance of a contractual duty is limited to an action for breach of contract, and a party to a contract is not liable in tort to noncontracting third parties."  Id. at 256; see Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 139 (2002) (concluding that snow plow contractor owed no duty of care to plaintiff and could not be held liable in tort); Church v. Callanan Industries, Inc., 99 N.Y.2d 104 (2002) ("[B]reach of a contractual obligation will not be sufficient in and of itself to impose tort liability to noncontracting third parties").

Based upon this well-established precedent, DCM and CAS had no common law duty to Mr. Woo or Mr. Rocco, and any obligations they possessed were a function of the relevant contractual undertakings at the Project.  To the extent the underlying cases were not settled (and all seven defendants were not insured by the same insurance policy issued by Underwriters), Tishman and Goldman Sachs would have borne statutory liability by way of Labor Law, and the subsequent apportionment of liability among the entities would have been dealt with via claims for breach of contract, indemnification and/or contribution.  The parties' respective obligations would have been determined by reference to the express contract terms.  Therefore, Underwriters' suggestion that the contractual obligations of the parties are irrelevant is entirely incorrect.  To the contrary, the contracts frame this Court's analysis of the parties' respective obligations and liability.[1]

---

[1] We note that Underwriters' hypothetical apportionment calculation on page 38 of their brief is not correct.  In particular, the ICSOP primary policy below Continental's umbrella policy provided coverage to DCM and CAS only.  Therefore, the first step is to calculate the share of the settlements attributable to DCM and CAS and then

## II.    THE DOCTRINE OF *RES IPSA LOQUITOR* DOES NOT APPLY

Underwriters' leading argument in support of their position that DCM and CAS bear 100% responsibility for the underlying accident is based upon *res ipsa loquitor*.  Underwriters acknowledges that this doctrine relies upon circumstantial evidence and posits that "items do not fall from a crane absent negligence."  See Und. Br. at 39.  Underwriters fails to demonstrate negligence by DCM and CAS either by direct evidence or a *res ipsa loquitor* theory.

### A.  Elements and Burdens

The theory of *res ipsa loquitor* applies "where a plaintiff shows that (1) the event does not usually occur in the absence of negligence, (2) the instrumentality that caused the event was within the exclusive control of the defendant, and (3) the plaintiff did not contribute to the cause of the accident."  Smith v. Moore, 227 A.D.2d 854, 855 (3d Dep't 1996).  The evidentiary significance of *res ipsa* is not a rebuttable presumption, but rather, a "permissible inference" from which a factfinder "may, but which is in no way bound to, infer negligence."  Weeden v. Armor Elevator Co., 97 A.D.2d 197, 204 (2d Dep't 1983).

Importantly, *res ipsa* "does not . . . . relieve plaintiff of the burden of proof" and that "onus never shifts to defendant."  Id.  Indeed, even where a "defendant offers no proof, it is still for the jury to decide, on plaintiff's proof, whether liability has been established."  Id.  It is only a "rare case in which a plaintiff will be entitled to a directed verdict because the prima facie proof is so convincing that the inference arising therefrom is inescapable if not rebutted by other evidence."  Id.; Smith, 227 A.D.2d at 855 ("[I]n general, the doctrine of res ipsa loquitor . . . does not justify summary judgment.").  "Most commonly, the inference together with any rebuttal evidence creates an issue of fact for the jury."  Weeden, 97 A.D.2d at 205.

---

subtract ICSOP's $1 million payment from the DCM/CAS share only (i.e., the $1 million should not be subtracted from the total settlement amount).  The remaining figure would then be split 50-50 between Underwriters and Continental.

Underwriters has not established the elements for a *res ipsa* inference.  As a threshold matter, the very premise of a *res ipsa* claim is that a **plaintiff** may obtain an inference of negligence against a defendant in order to present its case for damages caused by the alleged defendant.  Not a single one of the 14 *res ipsa* decisions cited by Underwriters involve the pursuit of a *res ipsa* theory by one alleged joint tortfeasor against another, and our research similarly has revealed none.

In this apportionment case, Underwriters stand in the shoes of Tishman, Goldman Sachs, and Total Safety (underlying defendants), not Woo and Rocco (underlying plaintiffs).  As discussed in Continental's opening brief, Tishman (and Goldman Sachs) is strictly liable for the accident and bears the burden to establish negligence by DCM and/or CAS to pass through any portion of the damages.  Tishman, Goldman Sachs, and Total Safety cannot meet their burdens of proof by speculation as to causation of the accident.

## B.  Things Can Fall From Cranes Absence Negligence in Hoisting

Without any citation to evidence, Underwriters asserts that "straps do not break" in the absence of negligence.  This statement is contradicted by both the report and testimony of Continental's expert, Timothy Carlsen (a licensed Professional Engineer, Certified Safety Professional, and Certified Safety Trained Supervisor Construction, among other designations). In particular, Mr. Carlsen found that "while the slings each had evidence of some wear and tear, the failures did not occur at any locations of such visible deterioration.  In fact, the area of the failure showed clean, linear tears across the web width."  See Ex. 31 at 20, ¶ 10.

During his deposition, Mr. Carlsen further explained that the photographs of the slings (which were relied upon by both Underwriters' expert and Continental's expert) indicate that the slings failed at the stitching between the choker metal hinge and the underlying body of the web material.  See Ex. 71 at 60:3-13.  Importantly, however, the photographs "won't tell you

why" it failed.   Id. at 60:23-61:2.   Mr. Carlsen testified that "there are so many other possibilities [for failure]" that would require testing that never was done.   Id. at 83:18-84:1.

By way of example, there could have been a latent defect in the slings or in the stitching in particular.   See Ex. 31 at 16 ("No evidence of excessive wear, abrasion, holes, chemical burns, heat burns or punctures were noted at the two failure locations.").   Tishman's own post-incident investigation report identifies a possible "hidden defect" in the slings as the potential cause of the failure.   See Ex. 59.   To that end, the manufacturer of the slings (Lift-All) contributed to the Woo settlement.

Therefore, although the breakage of the slings may have been the result of someone's negligence (i.e., the manufacturer), Underwriters cannot satisfy its burden to establish that things do not fall from cranes absent negligence in the hoisting.

### C.  The Hoisting Activities Were Not Within the Exclusive Control of DCM and/or CAS

The second requirement for a *res ipsa* claim is that the instrumentality causing the accident was "within the exclusive control of the defendant."   Again, Underwriters cannot satisfy this element, as Tishman and Total Safety were in control of the entire Project, including specifically the hoist on the day of the accident.

Tishman was the construction manager "*solely responsible for and have control over construction means, methods, techniques, sequences and procedures for the work, and for coordinating all portions of the work under the contract documents or otherwise required for good construction industry practice*."   See Ex. 52 at § 2.7.1.   In addition, Tishman was "solely responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the work, including safety of all persons and property during performance of the work."   See Ex. 53 at §2.4.1.   This obligation included coordination of "the work of separate contractors in order to facilitate the timely, efficient and safe completion of the work and the work of separate contractors," including deliveries and hoisting activities.   Id.

18

at § 2.9.2; § 2.9.2(f).   Tishman's superintendent had "total authority to stop someone if he was doing something they were not supposed to be doing" and could "absolutely" halt all work to avoid an unsafe condition.   See Ex. 60 (Cettina T1) at 14:4-13.

Likewise, Total Safety was responsible for "planning and coordinating all work so as to comply with the directives of the safety plan" and for providing guidance to contractors' personnel "in the planning and execution of all work so as to comply with the stated objectives of the safety plan."   See Ex. 50 at 14-18; Ex. 66 (Brehm T2) at 20:24-22:22.   Total Safety's Site Safety Supervisor, Donald Brehm, acknowledged that he had a duty to notify Tishman of any unsafe work at the site, or to stop it immediately on his own. See Ex. 66 (Brehm T2) at 25:22-27:19; Ex. 50 at 6.[2]

The evidence further reflects that Tishman was aware of all hoisting activities at the Project, directed all work performed by DCM, and approved all lift and hoist locations. See Ex. 61 (Cettina T2) at 145:24-146:22; 147:5-8. Tishman was aware for months prior to the accident that these large steel studs were going to need to be hoisted and was specifically aware of the fact that nylon straps were being used to hoist steel studs onto the 13th floor on the day of the accident. See Ex. 60 (Cettina T1) at 36:21-37:4; 40:8-18; 42:7-10; 48:9-22; 64:5-10; Ex. 61 (Cettina T2) at 95:11-16 ; 75:16-20; Ex. 57.  Mr. Cettina personally coordinated the logistics and procedure for the hoisting of these particular steel studs.  See Ex. 61 (Cettina T2) at 74:22-75:6; 76:16-79:3; 95:3-15.  Mr. Cettina approved the use of nylon slings to hoist the studs on that day instead of metal chokers and acknowledged that Tishman and Total Safety were responsible for ensuring that the slings were properly inspected before use.  See Ex. 60 (Cettina T1) at 89:20-90:10; 48:19-22; 60:11-21; Ex. 61 (Cettina T2) at 95:20-96:20.

---

[2] Underwriters' statement that DCM had its own safety consultant (Pro Safety) is of no import here.  There is no dispute that Total Safety was charged with safety responsibility for the entire site.  Nothing in the Site Safety Plan relieves it of those duties due to the presence of additional safety consultants.  It bears further noting that ProSafety was not sued in either the Woo Action or the Rocco Action.

Based upon the foregoing, both Tishman and Total Safety had control over the performance of the work and were responsible for ensuring compliance with the Site Safety Program and all applicable regulations.  Both Tishman and Total Safety had authority to stop any unsafe work or dangerous activity.  Both Tishman and Total Safety were responsible for ensuring proper inspection of the slings.  Tishman approved the use of nylon slings and coordinated the logistics for the specific hoist in question.  Tishman also designated the hoist location and the "pick zone" for the lift.  The fact that the slings were owned by CAS and loaned to DCM for hoisting does not render them "within the exclusive control" of CAS and DCM given Tishman's and Total Safety's undisputed control over the Project as a whole, including hoisting activities.

Continental disputes that a *res ispa* claim can be established as against DCM and CAS, however, if any inference of negligence is applied, it must apply equally to Tishman and Total Safety who possessed ultimate control over the site and all construction activity.  See Corcoran v. Banner Super Market, Inc., 19 N.Y.2d 425, 431 (1967) ("This shared or dual duty with respect to the [instrumentality] permits the application of res ipsa loquitor against either or both owners.");  Schroeder v. City & Cty. Sav. Bank, 293 N.Y. 370 (1944) (finding the doctrine of *res ipsa loquitor* to apply to multiple defendants that shared control of the accident site, including party with "nondelegable supervision" responsibility).

### D. Contributory Negligence By Plaintiff

The third and final requirement under the *res ipsa* doctrine is that the plaintiff did not contribute to the accident.  As discussed, the posture of this *res ipsa* claim is an anomaly.  The "plaintiff" is not raising the argument—certain defendants are raising it against other defendants.  Thus, the "plaintiff" for purposes of this analysis should be Tishman, Goldman Sachs, and Total Safety.  The negligence of these entities, which invalidates Underwriters' *res ipsa* theory, was addressed at length in Continental's opening brief and will be addressed in the following section

of this brief.  Even assuming that the analysis should focus on the underlying plaintiffs, there is direct evidence of contributory negligence on the part of Mr. Rocco.

In particular, Mr. Rocco was a truck driver for Norbet Trucking for over fifteen years at the time of the accident.  See Ex. 63 (Rocco T1) at 6:3-13.  In that capacity, he delivered steel to construction sites—in fact, he delivered steel studs almost exclusively during his tenure with Norbet Trucking.  Id. at 6:14-7:5; Ex. 73 (Rocco T2) at 16:17-24.  Mr. Rocco was no stranger to construction sites and the hoisting of steel studs from his truck.  After unstrapping the studs from the trailer, Mr. Rocco was standing outside the pick zone drinking coffee and watching the studs be unloaded from his trailer.  See Ex. 73 (Rocco T2) at 52:20-53:4; 53:20-54:2.  Mr. Rocco was aware of the hoisting activity and that he should have remained outside the pick zone.  Id.; Ex. 64 (Horn) at 113:12-115:2; Ex. 68 (Hickey) at 137:22-138:6.   While he was drinking his coffee, he began to look for a cigar he thought was in his shirt pocket when his cell phone rang. Id. at 54:25-56:4.  Mr. Rocco answered his phone (it was his wife calling) and decided he would get into the tractor because it was too noisy and he wanted to get a cigar.  Id. at 56:19-57:6.  Mr. Rocco testified that he had to walk 48 feet to get from where he was standing to the tractor/cab of his truck.  See Ex. 63 (Rocco T1) at 28:11-13.

In light of Mr. Rocco's extensive experience in delivering steel studs to constructions sites and the taped-off pick zone surrounding the trailer, it is clear that Mr. Rocco was contributorily negligent in disregarding instructions and safety protocols by returning to the cab of his truck to talk on his cell phone and retrieve a cigar.  This factor also negates Underwriters' attempt to rely upon *res ipsa* to place 100% of the liability upon DCM and CAS.

### E.  Continental Has Rebutted the Negligence of DCM and CAS and Presented Evidence of Negligence by Other Parties

The case law cited by Underwriter is distinguishable.  In each of the cases cited by Underwriters, the defendant failed to present ***any*** evidence to either rebut the inference of its negligence or to identify other potential causes of the accident.  See  Richard Equip. Corp. v.

21

Manhattan Indus. Contracting Co., 191 N.Y.S.2d 587, 588 (2d Dep't 1959) ("No attempt by respondent in its opposing affidavit to show the existence of evidence militating against the presumption of negligence."); Horowitz v. Kevah Konner, Inc., 67 A.D.2d 38, 42 (1st Dep't 1979) ("[T]he defendants have totally failed to come forward with any competent proof to rebut the inescapable inference . . . ."); Derrell v. Nassau Cty. Med. Ctr., 73 A.D.2d 682, 682 (2d Dep't 1979) (noting that plaintiff's proofs were "unrebutted by the defendants"); Notice v. Regent Hotel Corp., 429 N.Y.S.2d 437,  438 (1st Dep't 1980) ("There was a complete failure by defendant to present any such contrary evidence.").

As set forth in detail in its opening pre-trial memorandum, Continental has presented admissible evidence to support its contention that DCM and CAS complied with their contractual obligations and safety protocols and were not negligent.  See Doc. 438 at Argument Section IV.   In addition, Continental  has presented admissible evidence to establish Tishman's and Total Safety's negligence in causing the accident (in addition to Goldman Sachs' and Tishman's statutory liability under Labor Law §240(1), §200 and §241(6)).  Id. at Argument Sections II and III.

The doctrine of *res ipsa loquitor* does ***not*** apply where "it is at least equally probable that the negligence was that of another."  Corcoran v. Banner Super Market, Inc., 19 N.Y.2d 425, 431 (N.Y. 1967).  It is undisputed that Tishman decided to locate the office trailer on top of the sidewalk shed (contrary to the Logistics Plan for the Project) and allowed it to remain there even once substantial superstructure work was ongoing.   Despite its exclusive responsibility for coordinating the work of the trades in a safe and efficient manner, Tishman "didn't feel a need" to vacate personnel from the trailers during hoisting operations on the day of the accident.  See Ex. 61 (Cettina T2) at 25:19-26:10; 35:7-10; 88:4-25.   If Mr. Woo had not been in the trailer at the time of the accident, he would not have been injured.  Moreover, the placement of the office trailer on top of the sidewalk shed resulted in a change in the location

of the pick zone for the hoist.  If the original pick zone was utilized, the office trailer would not have been impacted.  <u>See</u> Ex. 31 at 10.  Tishman was responsible for setting the pick zone.  <u>See</u> Ex. 61 (Cettina T2) at 83:5-15; 150:5-151:8.  The Woo trailer was not within the pick zone, and DCM had no obligation to clear people beyond the pick zone.  <u>See</u> Ex. 60 (Cettina T1) at 71:18-72:8; Ex. 61 (Cettina T2) at 131:11-132:2; Ex. 64 (Horn) at 49:3-8; 123:2-18

Tishman's and Total Safety's failure to maintain safe operations at the site is even more egregious in light of the safety meeting held two days before the accident.  On December 12, 2017, representatives of Tishman and Total Safety were made aware of a need for **"[b]etter coordination so trades are not working directly over one another or install proper overhead protection**."  <u>See</u> Ex. 58 at 1 (emphasis in original).  The meeting minutes also identified a safety concern raised by subcontractors regarding the need for "[o]verhead protection for unloading trucks at the North hoist."  <u>Id.</u> at 2.   If Tishman and/or Total Safety had promptly addressed these issues prior to continuing hoisting activities at the site, the underlying injuries to Mr. Woo and Mr. Rocco could have been avoided.  But Tishman and Total Safety failed to do so.  These errors and failures constitute negligence and serve to rebut an inference that negligence on the part of DCM and/or CAS was the sole cause of the accident.

## III.   <span style="font-variant:small-caps">Underwriters Cannot Establish Causation for the Failure of the Slings</span>

Underwriters relies upon post-accident inspection and photographs of the slings to support an argument that DCM and CAS were negligent in using the slings on the date of the accident because they were old and/or worn.  While Continental disputes any negligence in this regard, Underwriters' argument is a red herring.  Indeed, there is no evidence in the record— offered by Underwriters or otherwise—to establish the *cause* of the sling failure.   Even if the slings did appear pre-accident in the same condition as they did post-accident, which is disputed, there is simply no evidence linking the age/condition of the slings to the accident.

To establish a viable claim for negligence, the plaintiff must establish that the defendant's breach of duty was the proximate cause of the alleged injury. Gerney v. Tishman Constr. Corp., 518 N.Y.S2d 564, 567 (Sup. Ct. 1987). Where a claim is based on speculation rather than direct evidence, the defendant is entitled to judgment as a matter of law. See Mendes v. Caristo Constr. Corp., 5 A.D.2d 268, 271-72 (1st Dep't 1958). In Mendes, where a sling broke causing injury to a worker, the court granted summary judgment in favor of a contractor where "the record [was] barren of any proof that the accident occurred because of an existing defect in the sling." Id. at 271. The court reasoned that "from the evidence, there could be no legally permissible inference that the sling was defective" and that "such a conclusion would be mere speculation." Id. at 272. The plaintiff bore "the burden of establishing that the proximate cause of the parting of the sling was a defect in the sling supplied; and there was no proof of that essential element." Id.

Similarly here, Underwriters bears the burden to establish that the proximate cause of the sling failure was DCM and/or CAS's alleged negligence. It cannot do so. Underwriters relies upon the opinions and testimony of an expert (Mr. Decker) and a representative of the sling manufacturer (Mr. Babinchak) to establish the alleged poor condition of the slings at the time of the accident. Importantly, however, neither Mr. Decker nor Mr. Babinchak examined the slings prior to the accident. See Ex. 72 (Decker) at 45:18-21; Ex. 70 (Babinchak) at 13:5-9; 103:8-10; 129:15-24. Mr. Decker has *never* seen the slings in person. Mr. Babinchak inspected the slings a month after the accident. See Ex. 70 (Babinchak) at 62:10-14; 132:8-17.

Although he identified various "snags" in the slings, Mr. Babinchak testified that there was only one that might have pre-dated the accident but that he "can't definitively say that it was damaged prior to that date." Id. at 164:20-166:10. For almost every other alleged defect captured in the photos, he testified that he did not know when the alleged damage occurred. Id.

24

at 141:3-148:7.  Mr. Babinchak similarly was unable to confirm that there was chemical damage to the slings at the time of the accident.  Id. at 62:21-63:4; 164:16-19.

In addition, Mr. Decker, Underwriters' retained expert for purposes of this case, admitted that the areas where the slings failed did not show any signs of wear—acknowledging that even if the slings had rips or tears as noted in the post-accident photos, those rips/tears may have had nothing to do with the accident.  See Ex. 72 (Decker) at 68:24-70:19; 99:4-10; 99:21-100:5.  This is consistent with the conclusions of Continental's expert, Mr. Carlsen.  See Ex. 31 at 20, ¶ 10 ("While the slings each had some evidence of some wear and tear, the failures did not occur at any locations of such visible deterioration.  To the contrary, the areas of the failure showed clean, linear tears across the web width.").  Mr. Carlsen further explained that the reason why the slings failed "is unknown" and that "[n]o testing or other materials investigation has been performed to determine why the slings failed in the same locations at the transition in stitching at the triangular choker fittings."  Id. at 20, ¶ 5.

Accordingly, even assuming there was some amount of "wear and tear" on the slings prior to the accident (which is contrary to the testimony of each witness who actually inspected the slings pre-accident), not one of Underwriters' witnesses can establish that the accident occurred because of those conditions in the slings.  It is undisputed that the failures in the slings—clean breaks in the same location on both slings—did not occur in any of the areas of the purported wear and tear.  As concluded in the Tishman investigation report immediately following the accident, it did "not appear that the rigging of the load or the hoisting were proximate causes of this incident" and "it is possible there was a hidden defect caused by faulty manufacture."  See Ex. 59 at 5-6.

Based upon the lack of any testing or evidence establishing the actual cause of the sling failure, Underwriters cannot meet its burden to show that DCM/CAS's alleged negligence in using the slings due to purported "wear and tear" was the proximate cause of the accident.

**IV.**     **COLLATERAL ESTOPPEL DOES NOT PRECLUDE LITIGATION OF THE LIABILITY APPORTIONMENT ISSUE**

Again attempting to prevent this Court from delving into the apportionment of liability, Underwriters also seeks to rely upon certain regulatory violations issued to DCM and CAS as evidence of their negligence or even, in the case of DCM, as a conclusive and binding determination of 100% fault.   Underwriters' assertions are contrary to the law and facts.

New York law is clear that a regulatory violation "does not establish negligence per se" but may only constitute "some evidence" of negligence which the factfinder "could take into consideration with all other evidence."  Cappellini v. McCabe Powers Body Co., 713 F.2d 1, 5 (2d Cir. 1983).   Underwriters focuses upon OSHA violations in its brief and, for a self-interested reason, avoids reference to the fact that violations issued by the DOB similarly may offer evidence of negligence.  See, e.g., Toribio v. 575 Broadway LLC, 2018 N.Y. Misc. LEXIS 5576, at *14 (N.Y. Sup. Ct. Nov. 21, 2018); Jainsinghani v. One Vanderbilt Owner, LLC, 162 A.D.3d 603, 604 (1st Dep't 2018)

In particular, Underwriters neglects to mention in its pre-trial memorandum that Tishman received two notices of violation from the DOB.  See Ex. 34.  Tishman was found to have violated Section 27-1009 of the Building Code for "failure to safeguard public & property effected by construction operations" and "operation of crane, derrick or hoisting equipment in an unsafe manner" with trailer placed on top of the sidewalk shed.  Id.  Tishman, represented by counsel, moved to consolidate the two violations into one violation, which was denied by the Administrative Law Judge ("ALJ") for the Environmental Control Board ("ECB"), who found Tishman "in violation" of "separate and distinct violations" and enforced the $5,000 in penalties approved by the ECB.  Id.  Tishman did not contest the violations on the merits and paid the penalties, which were greater than those imposed upon DCM and CAS, respectively. As a result, to the extent this Court is inclined to consider regulatory violations as evidence of

negligence, it must also do so with respect to the two violations issued and entered against Tishman.

Considering that Tishman also was subject to an ECB hearing and found to be in violation of two DOB regulations, it is inexplicable that Underwriters takes the position that the ECB findings against DCM conclusively establishes 100% fault to DCM.   As an initial matter, findings of the ECB, ALJ or OSHA may constitute inadmissible hearsay.   See Antoniello v. E. 51st St. Dev., 2012 N.Y. Misc. LEXIS 6276, at *27-28 (Sup. Ct. Jan. 17, 2012). Even if findings of fact were to be considered in a subsequent civil proceeding, it is well established that "conclusions of law are not admissible." Id. at *28.

In addition, New York courts have rejected efforts to establish civil liability and causation solely by reference to determinations of the ECB and ALJ.   Id.   In Antoniello, the court found the ALJ's findings inadmissible and untrustworthy as to the issue of an engineer's liability for a crane collapse accident where: 1) the only parties to the hearing were the DOB and the rigging contractor; 2)  the purpose of the hearing was to determine whether the rigger's license should be revoked; and 3) the "issue of causation of the crane collapse as it relates to all of the participants in the construction of the Building . . . [was] not addressed, and none of these parties . . . participated in the hearing." Id.  The court correctly noted that the engineer's services were not mentioned in the ALJ report since its potential culpability was not at issue in the hearing.  Id.

Similarly, here, the ECB hearing addressed only whether DCM had violated a specific regulation of the Building Code—not causation and apportionment of fault.[3]  Tishman was not involved in that hearing and, therefore, its potential liability was not relevant to the ECB's findings.  Of course, Tishman's violations of the Building Code were addressed (and confirmed)

---

[3] And, as discussed above, the ALJ's finding of a violation for using nylon slings was a misapplication of the cited provision in the Administrative Code.  See Statement of Facts at C.3.

by way of a separate proceeding in which DCM did not participate. Therefore, based upon analogous New York case law, this Court may not accept Underwriters' invitation to extrapolate the limited findings of the ECB for a regulatory purpose into a conclusive determination of liability and causation. To the extent violations of DOB or OSHA regulations are considered, they must be considered with respect to all parties.

More generally, Underwriters has failed to satisfy the requirements for collateral estoppel. The doctrine of collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that part or those in privity." Ryan v. N.Y. Tel. Co., 62 N.Y.2d 494, 500 (1984). There are two requirements: 1) "the party seeking the benefit of collateral estoppel must prove that the identical issue was necessarily decided in the prior action and is decisive in the present action"; and 2) "the party to be precluded from relitigating an issue must have had a full and fair opportunity to contest the prior determination." D'Arata v. N.Y. Cent. Mut. Fire Ins. Co., 76 N.Y.2d 659, 664 (1990). In determining whether a party had a "full and fair opportunity" to litigate the issue in the prior proceeding, New York courts will consider a number of factors, including whether the party was afforded the opportunity "to establish liability or culpability on the part of another." Schwartz v. Pub. Admin. of Cty. of Bronx, 24 N.Y.2d 65, 70 (1968); Ryan, 62 N.Y.2d at 501.

Underwriters has not met its burden to demonstrate that the issue of apportionment of fault between DCM, CAS, Tishman, Total Safety (and any other entities) was addressed and decisively determined in the ECB hearing. To the contrary, the sole issue determined by the ECB was whether DCM violated a particular section of the Building Code. There was no determination of the actual cause of the accident or consideration of the fault of parties other than DCM (which were dealt with by way of separate notices of violation and hearings under the Building Code).

New York courts have rejected collateral estoppel arguments in this exact factual scenario. See, e.g., Toribio v. 575 Broadway LLC, 2018 N.Y. Misc. LEXIS 5576 (Sup. Ct. Nov. 21, 2018). In Toribio, a subcontractor sought to dismiss cross-claims for contribution and indemnification asserted against it by the general contractor. The subcontractor argued that the general contractor's sole fault for the accident was determined in a prior ECB hearing. The court disagreed:

> [A] violation of the Building Code only constitutes mere evidence of negligence and not negligence per se. Moreover, the hearing before the ECB did not determine whether [general contractor's] negligence was a "substantial cause" of Toribio's injury. Rather, the hearing resolved only whether there was a violation of the Building Code . . . Thus, there was no identicality of issues in the ECB proceeding and in the present action.

Id. at *14; see also Verdugo v. Seven Thirty One Ltd. P'ship, 70 A.D.3d 600, 601-02 (1st Dep't 2010) (holding that construction manager was estopped from denying the previously-determined violations of the Building Code but was *not* estopped from contesting liability for the underlying injuries).

The same result applies here. DCM did not have a full and fair opportunity to litigate causation and liability for the underlying accident with all relevant parties present (nor did it "admit" sole fault for the accident). The issue determined in the ECB hearing was limited to whether DCM violated a specific code provision and, therefore, is not identical to the apportionment of liability inquiry before this Court. Continental is not estopped from contesting DCM's fault for the accident. Furthermore, and as already noted, to the extent findings of the ECB are relevant to this Court's analysis, Tishman received more violations and greater fines that DCM and CAS, thereby supporting apportionment of fault to Tishman.

29

## CONCLUSION

Continental submits that this Court is equipped to render a determination of liability for the underlying accident based upon the controlling contract documents, the ample testimony and documentary evidence, and the applicable law.  This Court need not accept Underwriters' invitation to ignore these pieces of information and rely upon circumstantial evidence. Underwriters' insureds—as owner, general contractor and site safety manager for the Project— bore responsibility for the underlying accident by way of statute and/or independent negligence. Underwriters has not satisfied its burden to shift that liability to DCM and/or CAS.

Respectfully submitted,

Dated: June 25, 2019
      New York, New York

KENNEDYS CMK LLP

      s/ Heather E. Simpson
Michael R. Schneider
Heather E. Simpson
570 Lexington Avenue, 8th Floor
New York, New York 10022
T:  (646) 625-4000

## CERTIFICATE OF SERVICE

HEATHER E. SIMPSON, deposes and says that she is over the age of eighteen years and an attorney with the law firm of Kennedys CMK LLP, counsel for Defendant Continental Casualty Company.

On the 25th day of June, 2019, deponent states that service of a true copy of the within document was made via electronic filing upon:

    Ira S. Lipsius, Esq.
    Alex Sperber, Esq.
    Lipsius-Benhaim Law LLP
    80-02 Kew Gardens Road, Suite 1030
    Kew Gardens, New York 11415
    Attorneys for Plaintiffs


Dated: June 25, 2019                          s/Heather E. Simpson
     New York, New York                    Heather E. Simpson